COMMONWEALTH *vs.* JAMES J. SAIA
(and a companion case[1]).

Suffolk.    November 4, 1976. — February 23, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & LIACOS, JJ.

*Practice, Criminal,* Motion to suppress. *Search and Seizure. Constitutional Law,* Search and seizure.

At a trial of indictments resulting from an alleged fight between police officers and the defendants on the defendants' premises, there was no error in the denial of a motion to suppress testimony as to the officers' observations or occurrences inside the premises; the exclusionary rule did not operate to suppress evidence which was a result of allegedly wilful acts of misconduct by the defendants. [56-58]

INDICTMENTS found and returned in the Superior Court on June 10, 1974.

Motions to suppress were denied by *Connolly,* J.

The defendants' applications for interlocutory appeals were allowed by *Reardon,* J., and the appeals were reported by him.

*William P. Homans, Jr.* (*Michael A. Ponsor* with him) for the defendants.

*Peter W. Agnes, Jr.,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J.   James J. Saia (James) and Charles J. Saia (Charles), having been indicted on various charges, each filed a pre-trial motion to suppress evidence, which

---

[1] The companion case is Commonwealth *vs.* Charles J. Saia.

motions were denied after hearing by a judge of the Superior Court. Their applications for interlocutory appeal of the judge's rulings (G. L. c. 278, § 28E) were thereafter allowed by a single justice of this court who reported the matters without decision for the consideration of the full court.

We conclude that there was no error in the Superior Court judge's denial of the motions to suppress evidence.

The facts are these. At 4:49 P.M. on April 13, 1974, an unidentified female called the Watertown police and complained that "a madman was fighting in the house at 28 Hardy Avenue." The police dispatcher directed two police cruisers to investigate the call.

The premises at 28 Hardy Avenue consisted of a two-family dwelling. Ten steps led from the street to a combination storm door and a solid door leading to a vestibule. Inside the vestibule area were mailboxes and doorbells. Two doors led from the vestibule. One door led to the first floor apartment, occupied by James's daughter; the other door led to a landing from which a flight of stairs gave access to the second floor apartment occupied by James, his wife, and three sons, one of whom was Charles.

When the first cruiser arrived at 28 Hardy Avenue the police officer heard loud shouting which appeared to come from the second floor. The first officer approached the front doors; the combination storm door was closed but unlocked, and the inner solid door was ajar, so that the officer could see into the vestibule area which he entered. The officer sought admittance to investigate the situation.

In response to the officer's request for admission, Charles came to the door leading to the second floor and opened it. When he saw the officer, he asked, "What the . . . are you doing here?" or, "What the . . . do you want?" The officer responded by telling Charles that there had been a complaint and to "keep it cool, keep it down." Charles continued speaking in an emotional and boisterous manner and asked, "Have you got a . . . warrant?" The officer again told Charles to "[k]eep it down."

The officer then heard more shouting from the second

floor. When he attempted to go beyond the inner door, Charles began to struggle with him. This struggle took place either entirely within the vestibule or partially on the landing immediately inside the door leading to the second floor. After a short period of time James came downstairs and joined in the struggle. A second officer who was responding in another cruiser to the original dispatch arrived and assisted the first officer who was then struggling with both Charles and James in the vestibule. The second officer and James eventually fought on the stairs leading to the second floor.

At no time did the officers possess a search warrant for the premises or an arrest warrant for any occupant of the premises. The first officer testified that at no time did he intend to conduct a search or to make an arrest and that the police came, in response to a citizen's complaint, for the purpose of keeping the peace.

We assume for purposes of this opinion, but we do not decide, that the incidents which gave rise to the indictments occurred at a place where James and Charles could have a reasonable expectation of privacy. See *Commonwealth* v. *Hall,* 366 Mass. 790, 793-795 (1975).

James was indicted for unarmed robbery of a police revolver; for assault and battery by means of a dangerous weapon; for assault with a dangerous weapon with intent to murder; for assault and battery on two police officers; and for disturbing the peace. Charles was indicted for assault and battery on two police officers; and for disturbing the peace.

James and Charles filed identical motions to suppress evidence which alleged a warrantless entry on April 13, 1974, onto premises lawfully occupied by each defendant at 28 Hardy Avenue, Watertown, and sought suppression of any testimony as to observations or occurrences inside the premises.

The details of the physical confrontation between the police officers and James and Charles are not before us. In view of the limited issues which we now consider, those details are not necessary or relevant.

After a hearing on the motions to suppress, the Superior Court judge found and ruled as follows: "I am going to deny the motion[s] to suppress. Without passing at this time on the legality of the presence of the police officers on the premises, I would find as a fact that Officer Montgomery did receive an anonymous phone call that there was a madman in the premises involved; that he requested the Watertown police officers in the cruiser to check out the premises or investigate whether or not there was any disturbance going on; that they went to the premises and they heard loud noises and they entered the premises, and that they did not have a warrant."

The principal arguments of James and Charles may be summarized as follows: The occupants of the Saia house were constitutionally protected from unjustified invasions of their privacy; in the absence of probable cause to believe that a felony was being committed, or had been committed, there was no justification for the warrantless entry; James and Charles had a right to resist entry and arrest and their doing so did not justify further intrusion; all observations made by the police officers, including their observations of the alleged conduct of James and Charles following the unlawful entry, should be suppressed. They rely on the principle ("fruits of the unwarranted intrusion") of *Wong Sun* v. *United States*, 371 U.S. 471, 485 (1963).

We have recently dealt with the principles which control in cases of warrantless searches. We have held that when a search is conducted without a warrant, the burden is on the Commonwealth to show that a particular search falls within a narrow class of permissible exceptions. *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974). In cases involving dwelling houses, we have held that an exception to the warrant requirement may arise in exigent circumstances, but there must be a showing that it was impracticable for the police to obtain a warrant, and the standards as to exigency are strict. *Commonwealth* v. *Forde*, 367 Mass. 798, 800-801 (1975). Basic to the Commonwealth's proof in justification of a warrantless entry for purposes of making an arrest is a showing that the

police had probable cause to believe that a felony had been committed, or was being committed. *Commonwealth* v. *Andrews,* 358 Mass. 721, 723-726 (1971).

We are not persuaded, for reasons discussed later in this opinion, that these principles relating to warrantless searches and arrests are relevant in the cases before us. If these principles were controlling, we think that the judge's denial of the motions to suppress could be supported on the ground that the entry of the police was lawful. This is on the assumption that the judge accepted as true all the evidence offered by the Commonwealth at the hearing on the motions.[2]

We think this evidence would in turn support conclusions that probable cause, exigency, and the impracticability of procuring a warrant had been shown. The person who telephoned the police was not shown to be a "reliable informant" within the context of probable cause (see *Aguilar* v. *Texas,* 378 U.S. 108, 112-116 [1964]), and indeed, even if she were shown to be reliable, it is doubtful whether the statement she made was sufficient to establish probable cause. However, things seen and heard by the police when they arrived at the premises, including the loud noises emanating from the house and the foul and abusive language of Charles when he first greeted the police, were sufficient corroboration to reach the level of probable cause to believe that a felony had been committed or was in progress in the house. See *Commonwealth* v. *Stevens,* 362 Mass. 24, 27-28 (1972). Although we must be vigilant to protect Fourth Amendment rights, the privileges of the police in the specific circumstances of these cases should not be measured on too fine a scale. The risk to the public safety is a significant factor.

We hold, in consideration of the policy behind the exclusionary rule, that the rule should not be applied to these cases. Presumably that was the reasoning of the judge

[2] The judge made no findings of fact as to some of the evidence, presumably on the ground that he, like this court, did not consider issues arising under the Fourth Amendment to the United States Constitution to be applicable.

Commonwealth *v.* Saia.

when he denied the motions to suppress evidence "[w]ithout passing at this time on the legality of the presence of the police officers on the premises."

Even if one assumes the illegality of the entry there is no showing that the evidence sought to be suppressed is an "exploitation" of the primary illegality. There is no simplistic "but for" analysis that applies in this area of the law. *United States* v. *Bacall,* 443 F.2d 1050, 1057 (9th Cir. 1971). These are not cases where the illegal entry leads to the seizure of evidence which produces an admission from a defendant. *Commonwealth* v. *Spofford,* 343 Mass. 703 (1962). Nor are they cases where the illegal entry gives an officer knowledge of prior or ongoing criminal activity and hence bars testimony as to such evidence. What is present here is simply an attempt to suppress evidence which is a result of allegedly wilful acts of misconduct by James and Charles, whose provocation and perhaps ultimate defense may be found in the fact of the entry itself. The exclusionary rule does not reach this far.

A just result can best be achieved by presenting the evidence (including the observations by the police officers which James and Charles seek to suppress), if that evidence is admissible in all other respects at a trial of the indictments. Whether the police entered the premises unlawfully, and whether James and Charles used excessive force, may become relevant issues at the trial. Finally, as to our conclusion that the rule of exclusion is not applicable here, we suggest this: Suppose a police officer or other person had been killed in the affray that allegedly occurred here. That hypothesis illustrates the inappropriateness of any ruling that the observations of the police were inadmissible under the exclusionary rule in the circumstances of these cases.

The ruling of the judge in denying the motions to suppress evidence is affirmed. The cases are remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*