COMMONWEALTH vs. CHRISTOPHER KING.

Bristol. January 5, 1983. — May 16, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & LYNCH, JJ.

*Search and Seizure,* Automobile, Expectation of privacy, Standing to object. *Constitutional Law,* Search and seizure.

A passenger in a station wagon charged with illegal possession of guns, ammunition and other items found by police in closed bags and the glove compartment of the vehicle had standing to challenge the legality of the search. [239-241]

A State police policy requiring investigatory checks of parked vehicles during winter months to determine whether assistance was required did not violate the Fourth Amendment to the United States Constitution. [241-242]

In the circumstances, a State trooper who had observed a black man and a white man at 2 A.M. seated in a station wagon parked in a highway rest area on a cold winter's night with the lights out and the engine running had no reasonable ground for further investigation or precautions after driver's licenses and a vehicle registration produced by the men had been verified by a negative response to a "missing and wanted check" and no response from the Registry of Motor Vehicles. [243-244]

Although State troopers investigating a parked station wagon had no probable cause to order a passenger out of the vehicle after they had verified driver's licenses and a vehicle registration produced by the passenger and the driver, they had probable cause to arrest the driver, to search him for weapons, and to search the station wagon after the driver had fired a weapon at the troopers and fled into nearby woods. [244-247]

INDICTMENTS found and returned in the Superior Court Department on February 17, 1982.

A motion to suppress evidence was heard by *Prince,* J. The defendant's application for an interlocutory appeal was allowed by *Liacos,* J., and the case was reported by him.

*William M. Kunstler* of New York (*Robert J. Doyle & Edward Berkin* with him) for the defendant.

*Phillip L. Weiner*, Assistant District Attorney (*Ralph K. Mulford*, Assistant District Attorney, with him) for the Commonwealth.

*Judith H. Mizner & John Reinstein*, for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

LIACOS, J.   On February 17, 1982, the defendant, Christopher King, was indicted by the Bristol County grand jury for the following offenses:   assault with intent to murder while armed (two counts); assault by means of a dangerous weapon (two counts); concealing firearms with obliterated numbers (four counts); unlawful possession of a controlled substance class D: unlawful possession of a controlled substance class B; unlawfully carrying a firearm without a license; and unlawfully carrying a firearm in a motor vehicle (three counts).   This case comes before us on an appeal from a ruling by a judge of the Superior Court denying the defendant's motion to suppress evidence seized during a warrantless search by a State trooper of his person and the automobile in which he was a passenger.   A single justice of this court allowed the defendant's application for interlocutory appeal pursuant to Mass. R. Crim. P. 15 (b) (2), 378 Mass. 882 (1979).   We uphold the judge's ruling, but on different grounds from those on which he relied.

The defendant argues that the judge erred in denying his motion to suppress the evidence.   He alleges that the initial inquiry by the State trooper to the occupants of the vehicle, the order given by the trooper to the defendant to leave the automobile, and the attempt by the officer to frisk the defendant violated his constitutional rights.   The Commonwealth argues that the judge correctly determined the issues raised by the motion to suppress, and, further, that the defendant lacks standing to challenge the admissibility of the evidence seized.

The facts found by the judge are as follows.[1]   On February 7, 1982, in the early morning, Officer Paul Landry, a

---

[1] The evidence before the motion judge was exclusively oral testimony. In such circumstance, we will not substitute our judgment for the judge's findings of fact absent clear error.   See *Commonwealth* v. *Moon,* 380 Mass. 751, 755-756 (1980).   There was no error in the judge's findings of

State trooper assigned to the State police barracks at Fox-
borough, was on routine patrol. Trooper Landry was fully
uniformed and driving a clearly marked State police cruiser.
He had been a State trooper for eight years[2] and had been
on this particular patrol duty for two and one-half years. At
the time of this incident, in the interest of public safety, and
because of the hazards of winter driving, the commanding
officer of A-Troop in Foxborough had a policy requiring
patrol officers during winter months to investigate every
stopped vehicle they encountered to determine whether the
occupants, if any, were disabled, had fallen asleep, had
abandoned the vehicle, or were otherwise in need of assist-
ance. The policy applied to any stopped or parked vehicle,
no matter where situated.

About 2 A.M., the trooper entered a rest area on the
southbound lane of Route 95 in North Attleborough.[3] As
the cruiser pulled in to the rest area, the officer observed
two parked vehicles, one van and one station wagon. He no-
ticed two individuals in the front seat of the station wagon.
Pursuant to the State police troop's policy, he decided to in-
vestigate. The officer passed the vehicles, made a U-turn,
and drove back to the station wagon in order to direct his
high beam headlights at the station wagon.

The officer's suspicions were aroused by the fact that one
of the occupants was white and the other was black.[4] Pull-

---

fact in this case. We consider only the conclusions that he drew from
them and the correctness of his rulings of law.

[2] Prior to his appointment as a State trooper, the officer had been a
town police officer for four years.

[3] The judge found that the rest area is the only one located on the south-
bound lane of Route 95 and is heavily used. The rest area has been the
subject of numerous complaints concerning homosexual activities, lar-
cenies, stolen cars, and harassment of persons using the rest area. The offi-
cer personally had made arrests at the rest area for disorderly conduct,
operating under the influence, operating after suspension of a driver's
license, possession of drugs, and possession of a dangerous weapon.

[4] The officer testified that he had very seldom seen black people in that
rest area during the last two and one-half years. In fact, he testified that,
of the few blacks that he had seen, he had stopped and questioned one or
two. He was unclear exactly when he noticed the racial composition of
the occupants of the station wagon.

ing the cruiser up at an angle to the right front of the station wagon, the trooper alighted from his automobile and approached the driver's side. As he approached, he observed that the vehicle's lights were off and the engine was running. He further noticed that the occupants were acting nervously and were looking at each other, and that the defendant had his right hand tucked inside his jacket near his belt on the left side of his body. Directing his flashlight into the interior of the station wagon, he observed a small green bag on the front floor at the defendant's feet, a duffel bag in the rear on top of the folded-down passenger seat, and a Doberman pinscher dog pacing back and forth in the rear.

The officer initially inquired what the occupants were doing in the rest area and where they were coming from. The driver responded that they were coming from New Hampshire and were trying to get some rest. The officer then requested identifications, licenses, and the vehicle registration. The driver produced a class 1 New York license with his picture stapled to it, identifying him as "Salvatore Bella." The defendant produced a class 5 New York license with a Brooklyn address, indicating that his name was "Lester Jordan."[5] There was no picture attached to the back of the license. Aside from minor details,[6] the licenses appeared valid.

At this time the defendant removed his hand from his coat, retrieved a Massachusetts registration from the glove compartment, and handed it to the driver, who in turn handed it to the trooper. Before examining it, the trooper inquired who owned the automobile. The response of the driver was that the automobile belonged to his girl friend,

---

[5] Subsequently, the defendant was identified as Christopher King. The driver was later identified as Jaan Laaman.

[6] The small print on the New York licenses indicated that a class 5 license did not require a photograph. The officer erroneously believed that all New York licenses had pictures. He apparently did not realize that the most common class 5 New York license does not require a photograph. The license issued in the name of Salvatore Bella had expired two weeks earlier. The trooper attached no significance to this fact since he had not observed the driver actually operating the vehicle.

Lucinda Keith, the name on the registration. Upon inquiry by the trooper, the driver stated that he did not know his girl friend's telephone number. Both men appeared to the trooper to be nervous at this time.

After asking the men to remain seated in their automobile, the officer returned to his cruiser to check their licenses and the registration. Prior to the check, however, he repositioned his cruiser parallel to the rear of the station wagon so that he could watch the occupants without being observed. The trooper testified on cross-examination that the repositioning of his cruiser was not normal procedure, but that he had a "gut feeling that there was something wrong with this car." While he testified that it was not uncommon for people to become nervous when questioned by a uniformed State trooper, he characterized the occupants' nervousness as different from the ordinary because it made him nervous, something that normally did not happen.

The officer requested, by use of his radio, a "missing and wanted" check on Salvatore Bella and Lester Jordan, as well as a registration check. The record check by the computer proved negative. The registration check yielded no response from the Registry of Motor Vehicles, which indicated that either the registration was new[7] or no such plate was issued.

Nevertheless, the officer was still not satisfied. He testified that he was suspicious because it was unusual to have New York licenses with a Massachusetts registration in a different name from both licenses, because the occupants kept nervously looking at each other and the trooper, and because he was concerned that the defendant might be concealing a weapon or drugs under his jacket. The trooper sought backup help because he had decided to approach the vehicle again to question the occupants further, and to search the defendant to determine what, if anything, he was concealing. On cross-examination the trooper acknowl-

---

[7] The defendant claims that this is the most likely explanation because the registration was dated only nine days earlier.

edged that his request for backup assistance was not normal procedure. Usually if the "missing and wanted" check and the registration check came back negative, that would be the end of the inquiry.

Very shortly thereafter, Officer Crosby, also a State trooper, arrived. The two State troopers approached the passenger side. Trooper Landry observed that the small green bag at the defendant's feet was no longer visible. He asked the defendant to step out of the automobile, and the defendant complied. Landry asked King what he had under his jacket and reached his hand toward the defendant's midriff. King pushed Landry's hand away and said that he had nothing there. Having felt what he believed to be a bullet-proof vest, Trooper Landry drew his gun and ordered the defendant to put his hands on his head. Again, the trooper reached near the defendant's belt, and again the defendant pushed his hand away.

At this point, the driver jumped out of the station wagon and began crouching alongside the station wagon back and forth, periodically popping his head up. Landry then backed the defendant up by the collar of his coat, keeping the defendant between himself and the driver. The driver moved to the rear of the station wagon, pointed a weapon, and fired three times. Trooper Landry pulled the defendant down and removed a loaded nine millimeter automatic pistol[8] from the defendant's belt in the same place the trooper had observed the defendant's hand. The defendant was handcuffed, and the trooper turned his attention toward the station wagon. Trooper Crosby was moving to a position to return the driver's fire. Although called upon to drop his weapon, Laaman fired two more shots and ran into the nearby woods. Trooper Landry then dragged the defendant, who refused to stand up, out of the line of fire.

---

[8] When the trooper subsequently examined the pistol, he found that it had one live round in the chamber and thirteen live rounds in the magazine. The serial number had been obliterated from the weapon.

Several additional State troopers arrived within minutes after Trooper Crosby radioed for assistance.[9]

King was taken to the Foxborough barracks. A search of the defendant's person at the barracks produced (1) a bullet-proof vest, (2) a license with a photograph of King, bearing the name of William Cray, (3) almost $1,600 in cash, and (4) a fully loaded ammunition clip fitting the confiscated pistol. After the defendant was transported to the barracks, troopers at the scene searched the vehicle. They found a large duffel bag in the rear of the station wagon and opened it. It contained firearms and ammunition.[10] A later search of the vehicle at State police headquarters revealed the small green bag under the front passenger's seat. It also contained weapons.[11] Additional items were found in the glove compartment.[12]

1. *Standing.* We consider first the Commonwealth's challenge to the standing of the defendant to move to suppress the evidence seized.

---

[9] The two shots hit and penetrated each trooper's cruiser. One of the troopers fired twice in the direction the driver was running. Other officers searched the woods but never found the driver. He has not been apprehended.

[10] The blue duffel bag contained (1) a .45 caliber volunteer semi-automatic carbine with a magazine containing thirty live .45 caliber rounds, (2) a 12-gauge Ithaca 37 featherlight shotgun, pump action, containing seven 12-gauge live rounds in the magazine and one live round in the chamber, and (3) sixteen 12-gauge shotgun shells. The serial numbers of the firearms had been obliterated.

[11] The contents of the green bag were (1) a .38 caliber Browning semi-automatic pistol with two magazines, both containing thirteen live cart-ridges and a live cartridge in the chamber, (2) eleven loose .38 caliber cartridges, (3) a double-edged dirk knife, (4) a bag of a substance suspected of being marihuana (it was not), and (5) numerous photo identifications of the driver with various names and a social security card bearing the same name as one of the photographic identifications. The serial number on the Browning was also obliterated.

[12] The record compiled by the parties does not contain the police report inventorying the items. Nevertheless, the parties stipulated that the ruling by the judge will apply to all evidence seized from the vehicle, whether or not specifically mentioned in the hearing or in the police report.

In order to have standing to contend that a search violates a constitutionally protected interest, the defendant must show a violation of his constitutional rights and not those of another. See *Goldstein* v. *United States*, 316 U.S. 114, 121 (1942). The judge concluded that the defendant did not have a proprietary or possessory interest in the vehicle or the objects seized, and that he did not have a legitimate expectation of privacy with respect to the vehicle. See *Rakas* v. *Illinois*, 439 U.S. 128, 147-149 (1978). Therefore, the judge concluded that the defendant did not establish the necessary interest in the vehicle or the property subsequently seized from the vehicle and, hence, did not have standing to seek to suppress such evidence. See *United States* v. *Salvucci*, 448 U.S. 83, 92 (1980). The Commonwealth argues that the record warrants this finding.

The judge did not have the benefit of this court's opinion in *Commonwealth* v. *Podgurski*, 386 Mass. 385 (1982). In the wake of the confusion created by the abolition of the "automatic standing" rule of *Jones* v. *United States*, 362 U.S. 257 (1960), we had to decide under what circumstances occupants of a vehicle may entertain a legitimate expectation of privacy.[13] See *Rakas* v. *Illinois, supra* at 143-144 & n.12. We stated "that *Rakas* should not be read to deprive a 'mere' passenger of standing to object to a search where, but for his lack of a property interest in the vehicle, his situation is otherwise identical to that of the owner, who has the requisite standing." *Commonwealth* v. *Podgurski, supra* at 392. Thus, the defendant has standing if he, as an occupant of the station wagon, had a legitimate expectation of privacy.

While we have recognized that an automobile affords a diminished legitimate expectation of privacy in comparison

---

[13] It was not necessary in *Commonwealth* v. *Podgurski*, 386 Mass. 385 (1982), to determine whether we should adhere under our State Constitution to the "automatic standing" rule of *Jones* v. *United States*, 362 U.S. 257 (1960). *Id.* at 391 n.11. The legitimate expectation of privacy principle set forth in *Rakas* v. *Illinois, supra,* answers the dilemma here. See *Commonwealth* v. *Podgurski, supra.*

to other property, we have held that such an expectancy exists in areas otherwise free from observation except by physical intrusion. *Commonwealth* v. *Podgurski, supra* at 389. "[T]hese places must include at least the trunk, the glove compartment, closed containers in the interior, and in most cases, the area under the seats." *Id.* The objects which King has been charged to possess illegally were found in closed bags and the glove compartment. There is no claim that these objects were contraband or evidence of criminal activity in plain view. See *Commonwealth* v. *Podgurski, supra* at 386. We conclude that King has standing to challenge the admissibility of the seized evidence.

2. *Violation of the defendant's Fourth Amendment rights.* There is no dispute that the defendant was seized and the car was searched. The trooper's repositioning of his cruiser blocked the station wagon in place. Such action constituted a show of authority and force that would lead a reasonable person to conclude that he was not free to go. *United States* v. *Brignoni-Ponce,* 422 U.S. 873, 878 (1975). *Terry* v. *Ohio,* 392 U.S. 1, 16 (1968). The validity of the search and seizure must, therefore, be addressed. Although the parties have argued a number of theories, we need only consider three questions to dispose of this appeal: (1) Was the policy of the State police requiring investigatory checks of stopped vehicles during winter months constitutional? (2) Was the scope of the inquiry permissible? and (3) If the search was illegal, is the evidence seized to be suppressed as the fruit of that illegality?

a. *The investigatory check.* The investigatory check of a parked vehicle during winter months, regardless of its limited purpose and brevity, is an intrusion on privacy rights. *Terry* v. *Ohio, supra* at 17. Thus, such a check constitutes a search within the meaning of the Fourth Amendment and is required by the very purpose of the Fourth Amendment to be reasonable. See *Delaware* v. *Prouse,* 440 U.S. 648, 653-654 (1979). The test for determining reasonableness requires balancing the need to search against the invasion that the search entails. *Commonwealth* v. *Silva,* 366 Mass. 402, 405 (1974). See *Delaware* v. *Prouse, supra* at 654.

In most cases, the analysis depends on an initial determination whether the stop was justified. Here, the vehicle was stopped already, and the encounter was not initiated in a traditional *Terry* approach. *Commonwealth* v. *Silva, supra* at 406 n.1. The initial inquiry here was for an entirely different purpose from the detection or investigation of possible violations of criminal statutes or violations of vehicle use regulations. See *Marshall* v. *Barlow's, Inc.,* 436 U.S. 307, 312-313 (1978). Cf. *Commonwealth* v. *Accaputo,* 380 Mass. 435, 438 (1980). The purpose of the investigatory check was to determine whether there was a need by the State trooper to render assistance or aid.

Winter weather presents unique hazards to the driving public, e.g., carbon monoxide poisoning from the vehicle's heater, freezing to death in a disabled vehicle, and frozen gasoline lines or snowstorms causing disabled vehicles. The Commonwealth, through exercise of its police power, has a strong interest in protecting the public from these potentially life threatening hazards. The very limited and focused inspection of a vehicle to determine whether assistance or aid is required is a minimal intrusion on the occupant's, or owner's, expectation of privacy. The situation here does not involve a random stop causing concern, fright, or anxiety. See *Delaware* v. *Prouse, supra* at 657. It does not involve a situation where a more limited alternative is possible or where there is no constraint on the discretion of the law enforcer. See *United States* v. *Brignoni-Ponce, supra* at 882-883. The policy required every stopped and parked car to be inspected.[14] The policy limited the intrusion only to that time period when the hazards arise.

In these circumstances, we cannot say that the investigatory check was unreasonable or violative of the Fourth Amendment rights of the defendant.

---

[14] The trooper had checked every parked or stopped car that he had come upon during his patrol on that particular night. He had no opportunity to check the van before it left the rest area.

b. *Scope of inquiry.* We must determine next whether the scope of inquiry was permissible. See *Commonwealth* v. *Loughlin,* 385 Mass. 60, 63 (1982); *Commonwealth* v. *Ferrara,* 376 Mass. 502, 505 (1978).

An investigating officer's actions must "be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience." *Commonwealth* v. *Silva, supra* at 406. In addition to making a stop and conducting an inquiry, an officer may, if the facts warrant, take reasonable precautions for his safety. *Commonwealth* v. *Loughlin, supra* at 62. A trained law enforcement officer may draw inferences and make deductions that would elude a lay person. See *United States* v. *Cortez,* 449 U.S. 411 (1981). The evidence must be analyzed in terms "understood by those versed in the field of law enforcement." *Id.* at 418. Cf. *Commonwealth* v. *Thibeau,* 384 Mass. 762, 764 (1981). Nevertheless, the standard is an objective one. *Commonwealth* v. *Silva, supra.* A mere hunch or "a gut feeling that there was something definitely wrong" on the part of the officer is insufficient to satisfy the requirement of specific and articulable facts. The question is whether a reasonable person in the trooper's position would be justified by some objective manifestation to suspect that the defendant was, or was about to be, engaged in criminal activity or would be warranted in the belief that his safety or the safety of others was endangered. See *United States* v. *Cortez, supra* at 417; *Commonwealth* v. *Almeida,* 373 Mass. 266, 271 (1977); *Commonwealth* v. *Silva, supra.*

We have no doubt that the trooper was permitted to ask for an explanation of the defendant's presence under the circumstances. The justification of his actions terminated, however, upon the driver's responses. Resting in a parked vehicle is the purpose for which the public highways provide a rest area. The response that the driver and the defendant were coming from New Hampshire is appropriate, considering that the rest area was on a major interstate highway connecting New Hampshire and Massachusetts.

Although we may assume that the trooper acted properly within the limits of the investigatory check in asking for licenses and registration,[15] it is not extraordinary for an individual licensed in one State to borrow a car registered in another State. The licenses were valid except for the expiration date, a fact to which the trooper attached no significance. The negative response to the "missing and wanted" check supported the defendant's answers. The trooper acknowledged that a new registration would not get a response from the Registry. Thus, all we have are the trooper's observations of a white man and a black man seated at 2 A.M. in a station wagon in a rest area designated for travelers, parked on a cold winter's night with the lights out and the engine running to provide heat. These facts were insufficient to justify a further intrusion on the rights of the occupants of the vehicle. See *United States* v. *Cortez, supra* at 417; *Commonwealth* v. *Loughlin, supra*; *Commonwealth* v. *Ferrara, supra* at 504-505; *Commonwealth* v. *Silva, supra.*

Once King and the driver produced their licenses and a registration and the documents had been verified as much as possible by the "missing and wanted" check and the Registry check, any justifiable investigation was ended. There was no reasonable ground for further investigation or precautions. *Commonwealth* v. *Loughlin, supra.* See *Commonwealth* v. *McCleery,* 345 Mass. 151, 153 (1962).

3. *Independent and intervening acts.* Having concluded that the investigatory inquiry was constitutional but that

---

[15] See *Commonwealth* v. *Loughlin,* 385 Mass. 60, 62 (1982) (justifiable inquiry complete on production of valid license and registration); *Commonwealth* v. *Thibeau,* 384 Mass. 762, 763-764 (1981) (no threshold inquiry creating reasonable suspicion); *Commonwealth* v. *Bacon,* 381 Mass. 642, 644 (1980) (if valid stop, may check license and registration); *Commonwealth* v. *Ferrara,* 376 Mass. 502, 505 (1978) (if valid stop, no basis for further investigation if valid license and registration are produced); *Commonwealth* v. *Almeida,* 373 Mass. 266, 270 (1977) (legitimacy of initial inquiry); *Commonwealth* v. *Riggins,* 366 Mass. 81, 87 (1974) (questioning disclosed occupants had no identification); *Commonwealth* v. *McCleery,* 345 Mass. 151, 153 (1962) (license and registration verification only are justifiable during routine check).

the troopers exceeded the limited scope of proper inquiry, we turn next to consider whether the evidence seized must be suppressed as the fruits of an unlawful seizure. See *Commonwealth* v. *Loughlin, supra* at 63.

The judge concluded that the evidence should not be suppressed because he decided that the search was not unlawful. We reach the same result, but on different grounds. The judge based his conclusion on his ruling that the exit order and the pat-frisk were within the scope of the initial inquiry, a ruling with which we have disagreed. We note that, had this been a different situation in which the driver had not attacked the investigating troopers, the evidence would be inadmissible as fruit of the poisonous tree. What distinguishes this case from cases such as *Commonwealth* v. *Loughlin, supra,* and *Commonwealth* v. *Ferrara, supra,* is the driver's independent and intervening action of attacking the troopers. These acts broke the chain of causation and dissipated the taint of the prior illegality. "Even if one assumes the illegality . . . there is no showing that the evidence sought to be suppressed is an 'exploitation' of the primary illegality. There is no simplistic 'but for' analysis that applies in this area of the law. . . . What is present here is simply an attempt to suppress evidence which is a result of allegedly wilful acts of misconduct" by the driver of the vehicle. *Commonwealth* v. *Saia,* 372 Mass. 53, 58 (1977). Accord *People* v. *Townes,* 41 N.Y.2d 97, 102 (1976).

The attack by the driver rendered the troopers' subsequent actions appropriate. The chain between the evidence seized and the illegal scope of inquiry was broken by the driver's wrongful actions. Up to the occurrence of those actions, no evidence had been discovered or seized. The evidence was not discovered as a result of police misconduct, but rather as the result of the driver's assault on the officers. After the driver shot at the troopers, a new situation arose creating probable cause to arrest the defendant (and the driver) and to conduct a search of the defendant incident to that arrest. There was probable cause to believe that the

defendant was in possession of a weapon when the driver began to fire at the troopers. It would be reasonable for the troopers to conclude that the defendant was a part of the attack and was armed also. Thus, the arrest of the defendant was valid, and the search of his person incident to the arrest was justified under both Federal and State law. *Chimel* v. *California,* 395 U.S. 752, 756 (1969). *Commonwealth* v. *Bowden,* 379 Mass. 472, 477 (1980). G. L. c. 276, § 1. Cf. *Commonwealth* v. *Saia, supra* at 57.

Additionally, there were probable cause and exigent circumstances justifying a warrantless search of the vehicle. See *Commonwealth* v. *Antobenedetto,* 366 Mass. 51, 57 (1974). Cf. *Commonwealth* v. *Marchione,* 384 Mass. 8, 10 (1981).[16] Warrantless searches of automobiles are permissible when exigent circumstances exist and the law enforcement officers have probable cause. See *Chambers* v. *Maroney,* 399 U.S. 42, 50-51 (1970); *Carroll* v. *United States,* 267 U.S. 132, 155 (1925). See *Commonwealth* v. *Haefeli,* 361 Mass. 271, 277-278 (1972); *Haefeli* v. *Chernoff,* 526 F.2d 1314, 1316-1318 (1st Cir. 1975). When the armed driver emerged from the vehicle and commenced firing at the troopers, and when the defendant had to be dragged out of the line of fire, and then, upon arrest, the defendant was found to be armed, we conclude that there was probable cause to believe that contraband or firearms were .

---

[16] We do not rely on the concept of a search incident to an arrest in our determination of the validity of the warrantless automobile search. See *Commonwealth* v. *Toole, ante* 159 (1983), holding that, under G. L. c. 276, § 1, a warrantless search of a vehicle incident to the arrest of the occupant cannot be justified, although such a search may be valid under Federal law. We note also that *Toole, supra,* could be distinguished by the failure of the Commonwealth in that case to establish probable cause to search the vehicle. See *Commonwealth* v. *Moon,* 380 Mass. 751, 760 (1980). As stated in the text, the case at bar involves not only probable cause to arrest the defendant, and to search his person incident to that arrest, but also independent probable cause to search the vehicle and exigent circumstances justifying a warrantless search of the vehicle. In short, on these facts, even if there had been no arrest (e.g., if the defendant, like his companion, escaped apprehension), the search of the vehicle would be valid.

located in the vehicle. The troopers at the scene were thus faced with a vehicle containing an agitated Doberman pinscher dog, an armed driver who fled into the woods and could not be found, and an uncooperative defendant who had been armed. It was somewhere between 2 and 3 A.M., in a rest area of a major interstate highway. There was not only probable cause to search the vehicle, but also ample showing of exigent circumstances to justify an immediate, warrantless search under the authority of *Chambers* v. *Maroney, supra,* and *Carroll* v. *United States, supra.*

Furthermore, as the United States Supreme Court has recently made clear, a search of the vehicle and its contents, including the green bag and the duffel bag, was within the proper scope of the search. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States* v. *Ross,* 456 U.S. 798, 825 (1982). The fact that part of the search of the vehicle occurred at the scene, and part of the search occurred at police headquarters, is immaterial. *Chambers* v. *Maroney, supra.* Cf. *Cady* v. *Dombrowski,* 413 U.S. 433, 447 (1973). *Commonwealth* v. *Matchett,* 386 Mass. 492, 509-510 (1982).

We conclude that, when the gunfight began, the troopers had probable cause to believe that the defendant also had a weapon, that the vehicle probably contained firearms or contraband, and, further, that there was the requisite nexus between the items seized in the vehicle and the criminal conduct of the driver.

"Although we must be vigilant to protect Fourth Amendment rights, the privileges of the police in the specific circumstances of these cases should not be measured on too fine a scale. The risk to the public safety is a significant factor." *Commonwealth* v. *Saia, supra* at 57.

The ruling of the trial judge denying the motion to suppress is affirmed. The case is remanded to the Superior Court for further proceedings.

*So ordered.*