Cowin, J.
Defendant Bobby Bland is indicted for trafficking in cocaine and possession of a class D controlled substance. He has filed a motion to suppress all evidence seized on December 14, 1993 as a result of an allegedly warrantless stop of the taxicab in which he was riding. He maintains that this stop violated his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, Articles 12 and 14 of the Declaration of Rights of the Massachusetts Constitution and G.L.c. 276, s.l.
On the date in question, the defendant was seen throwing contraband from his person after a stop of a taxicab in which he was a passenger. The stop was made by Boston Police detectives pursuant to an order of the Boston Police Commissioner known as “Operation Taxi.” This order directs the police to make frequent stops of taxicabs in high-crime areas in order to check the safety of the operators. After an evidentiary hearing on August 15, 1994 at which one witness, Detective Robert Rogers, testified, this Court concludes that the motion to suppress should be allowed.
FINDINGS OF FACT ,
On December 14, 1993, at about 6:30 p.m., Detective Robert Rogers of the Boston Police Department Anti-Gang Violence Unit was in an unmarked cruiser conducting a drug investigation at 126-128 Ruthven Street (near the intersection of Humboldt Avenue) in Roxbuiy with two other officers: Boston Police officer William Parlón and Agent Granatino of the United States Treasury Bureau of Alcohol, Tobacco and Firearms.
Ruthven Street is a residential street, with both apartment buildings and single- and two-family homes. It is a narrow street and cars were parked on both sides at the time in question. The Ruthven Street-Humboldt Avenue area is a high-crime area, one in which Det. Rogers had worked for about four years. He has made 200-300 drug arrests during this time in that specific area. Of those arrests, approximately fifteen involved large quantities of drugs. When large quantities of drugs are at issue, the police usually also have found firearms. Through his work, Det. Rogers is familiar with drug sales and the price of drugs in the area.
On December 14, 1993, Det. Rogers saw one Troy McCall, the target of the instant investigation, walking back and forth nervously in front of 128 Ruthven Street. Rogers had information that McCall was the head of a drug supply operation that was centered at 126-128 Ruthven Street. Rogers observed that McCall was smoking a “blunt,” a large marijuana cigar. The cigar was visible to the police officer from the street as it is quite large and distinctively covered in cigar wrappings. Det. Rogers stopped McCall for possession of marijuana, took the marijuana cigar from him and found $250 cash in his rear pocket and $300 cash in his front pocket.
Det. Rogers was aware that the street price of an “8-ball” of crack cocaine (one-eighth of an ounce) at this time ranged from $125-$ 175, depending upon available supply and demand. He believed that the money in McCall’s pockets had been separated into units for a drug buy. He put McCall in the rear seat of the cruiser and asked him what he was doing. McCall said that he was just out smoking a joint.
While the police were conversing with McCall, Det. Rogers saw a taxi pass slowly by his cruiser. The taxi almost stopped in front of 126-128 Ruthven Street, but proceeded on another thirty yards, to the intersection of Humboldt Avenue, a major intersection. Det. Rogers ordered McCall out of the cruiser at that point because he (Rogers) had decided to follow and stop the taxicab. Rogers was aware that taxicabs are used to distribute drugs in that area of the city and he testified that he had decided to stop the taxicab pursuant to Operation Taxi.
Operation Taxi is an order of the Boston Police Commissioner, special order number 91-32, entitled: ‘Taxi Cab Driver Safety Issues” (Exhibit #1 attached). The order was issued May 9, 1991, as a response to violence against taxicab drivers and in order to help ensure the safety of taxicab drivers. The order provides in pertinent part:
. . . [PJersonnel are actively encouraged to make frequent stops of taxicabs for the purpose of checking on the operator’s safety. Stops should be conducted when, and wherever necessary, particularly during the evening and early morning hours. Attention should be given to isolated and high-crime areas. Taxicabs will not be detained longer than is necessary to check on the welfare of the operator. Passengers in occupied taxicabs will receive a brief explanation of the purpose of the stop: Driver Safety.
A B.P.D. form 1833 will be completed at the time of the check. Most of the information required to complete this form is readily available on the exterior of the cab, the driver’s name is not essential.
All personnel are further reminded of the significance of the two amber emergency lights (emphasis in original) affixed to the roof of taxicabs . . . These lights will flash continuously when activated by the driver when he/she is in need of police assistance. Should an officer observe these lights activated, every effort will be made by the officer to stop the taxicab to determine if the driver is in danger or in need of assistance.
*477 Det. Rogers saw the taxicab stop at the comer of Ruthven and Humboldt and turn the corner onto Humboldt. There is no stop sign at the intersection of Ruthven and Humboldt, but it is necessary to stop there because Humboldt is a main street. Rogers followed the cab and activated his blue lights and siren as he turned his cruiser onto Humboldt Avenue. The driver of the taxi pulled it over and stopped almost immediately after the cruiser’s blue lights and siren were activated. The taxi had committed no traffic violation.
When Rogers activated his blue lights, he had observed the defendant Bland in the back seat of the cab. Bland turned and looked at the cruiser. This was the first time that the detective was able to see the defendant and he realized that he did not know him and had never even seen him before. The detective was able to see the defendant from the lights of his cruiser and the artificial lights in the area.
When the cab stopped, the defendant jumped out and started running. The police chased after him. Det. Rogers saw the defendant throw two large plastic bags of white rock substance to the ground. The detective stopped to retrieve it and found that it contained two “8-balls” of cocaine. The other two officers continued their pursuit of Bland and eventually tackled and arrested him. Officer Parlón found four more “8-balls” of crack cocaine on the defendant.
Det. Rogers testified that he stopped the taxicab out of concern for the safety of the taxi driver. He conceded, however, that in the three years since Operation Taxi took effect he has made only twelve such safety stops in the Ruthven Street-Humboldt Avenue area, even though there are innumerable taxis in that section. He testified that he stopped this particular cab because he believed that a drug sale was about to take place, that drug sales involving large amounts of cocaine often involved the use of guns and that the cab driver was therefore in danger.
I find that Operation Taxi is being used as a sham in this case. Detective Rogers did not stop the cab from concern for the operator’s safety. Rather, his stop of the cab was clearly related to his drug investigation activities. The detective was engaged in drug investigation at the moment that he saw the taxicab pass by; indeed, he was involved in a conversation with the person he believed was the head of the drug operation. The detective abandoned this man in the midst of a conversation in order to pursue the cab that he saw slow down in front of the building the detective believed housed the drug operation. Det. Rogers even concedes that he believed that illegal drug activity was about to occur in or involving the taxicab. It is impossible to conclude that the stop of the taxi was due to anything other than the drug work in which Det. Rogers was engaged. Thus, I conclude that Operation Taxi is being used as a cover for this stop.
Further, there is nothing more than a hunch to indicate that the passenger in this particular cab was about to engage in a drug transaction. The fact that the cab slowed in front of 126-128 Ruthven Street is not significant. The cab was only thirty yards from the intersection of Humboldt Avenue at that time and the street was a narrow, residential one. It was not unreasonable to begin to slow down at that point for the intersection. Secondly, even if a drug sale were about to take place, there is nothing to indicate that the cab driver was in any danger.
As stated above, I find that the stop of the cab was not made for reasons related to the safety of the taxi driver. It cannot be justified by Operation Taxi, even were I to assume that the order establishing the procedure is constitutional.
RULINGS OF LAW
The defendant has challenged on both state and federal constitutional grounds the legality of the stop of the cab and the subsequent seizure of the drugs. Initially, the question of standing must be addressed. The defendant was merely a passenger in the cab. Massachusetts follows the automatic standing rule of Jones v. United States, 362 U.S. 257 (1960). Accordingly, since the defendant here is charged with a crime in which possession of the seized evidence is an essential element, the defendant is deemed to have standing to contest the legality of the search and seizure of that evidence. Commonwealth v. Amendola, 406 Mass. 592, 601 (1990).
On the evidence presented, the Commonwealth has not sustained its burden of showing that the police stopped the taxi for reasons related to the safety purposes of Operation Taxi. Thus, it is not necessary to reach the question of the constitutionality of the police order establishing Operation Taxi. See Commonwealth v. Cosme, 2 Mass. L. Rptr. No. 4, 78 (May 30, 1994) (Volterra, J.).[1] In the present case, the police are attempting after the fact to use Operation Taxi as the basis for justifying a stop made because of a hunch that drug activity was taking place or was about to take place by a person in the taxicab. For Operation Taxi to have any possibility of surviving a constitutional attack, the safety of the cab driver must be the motivating factor for the stop. It cannot be an incidental factor that serves to justify an otherwise illegal stop.
The stop cannot be validated on Terry grounds either. Terry v. Ohio, 392 U.S. 1, 16 (1968); Commonwealth v. King, 389 Mass. 233, 241-42 (1983). Hiere is insufficient evidence of specific and articulable facts to justify a reasonable suspicion that illegal activity involving the taxicab or anyone in it was occurring or was about to occur. Commonwealth v. Silva, 366 Mass. 402 (1974).
Since the stop was unconstitutional, the evidence obtained as a result of that improper stop (the cocaine) must be suppressed as the “fruit of the poisonous tree.” Wong Sun v. United States, 371 U.S. 471, 484-86 (1963).
ORDER
For the foregoing reasons, the defendant’s motion to suppress is ALLOWED.

 Nor is it necessary to consider whether the police order were properly promulgated.