King, J.
Defendants, James Carle (Carle) and Keith Taylor (Taylor), were arrested on June 19, 1994, and charged with trafficking in cocaine, unlawful possession of a firearm, unlawful possession of ammunition, possession of marijuana with intent to distribute, receiving a firearm with an obliterated serial number and conspiracy. Carle and Taylor move to suppress the physical evidence seized at the time of their arrest because the stop which resulted in the discovery of the evidence sought to be suppressed was unlawful in violation their rights under the Fourth, Fifth and Sixth Amendments of the United States Constitution and articles 12 and 14 of the Massachusetts Declaration of Rights. An evidentiary hearing was held on September 11, 1995. At the conclusion of the hearing the court allowed the Commonwealth to supplement the record with affidavits describing the background of the Boston Police Department’s “Operation Taxi” policy. Two affidavits were subsequently filed. For the reasons stated below, Defendants’ Motions to Suppress will be ALLOWED.
FINDINGS OF FACT
On June 19, 1994 officers Robert Rogers, William Parlón and Michael Feeney of the Boston Police Department (B.P.D.) were on patrol in an unmarked police cruiser on Warren Street in Roxbury, near Dudley Station, a high crime area. All three men were in plain clothes but had badges which were visible once they stepped outside their vehicle.
While on Warren Street, at about 6 P.M., the officers observed a taxi, with two male passengers in the back seat, driving towards them. In accordance with a departmental policy known as “Operation Taxi,” they turned their cruiser around, pulled behind the taxi and activated their blue lights to effectuate a stop.
“Operation Taxi” refers to a B.P.D. policy promulgated in the early 1990s in response to requests by the taxi industry in Boston. During that period, the industry was suffering from a rash of armed robberies and murders of taxi drivers occurring primarily at night and in high crime areas. Commissioner and Deputy Superintendent Donald Devine, then Commander of the department’s Hackney Carriage Division, held a series of meetings with members of the industry, including representatives of the professional taxi associations operating in the City. The result was the development of the policy known as “Operation Taxi.”
“Operation Taxi” requires that all Boston Police officers — particularly at night and in high crime areas — to periodically stop taxis to ascertain the well-being of the drivers. The stops are to be brief, and the officers are to identify themselves and notify both the drivers and any passengers of the purpose of the stop. Once they determine that all is well they allow the taxi to continue on its way. The policy has been reduced to writing and is posted in police stations throughout Boston. Additionally, the policy is broadcast over the police radios several times each evening. Although “Operation Taxi’s” objective is characterized by the police as a program to assure “driver safety,” in substance, it provides for investigatory stops of taxis in order to thwart crimes against drivers.
In this case, after the officers pulled the taxi over, the passengers in the back seat exited the cab on opposite sides and stood facing the approaching police officers who had not drawn their weapons. As officer Parlón approached the taxi he glanced through the rear window and saw the barrel of a gun protruding from an open duffle bag. It was still daylight and the officer was able to see inside the taxi. He told the other officers to arrest the defendants. The defendants were arrested and brought to the police station where they were booked and searched. In the duffel bag, taken from the back seat of the taxi, the officers found a 9 mm handgun containing several hollow point rounds of ammunition, a plastic bag containing 36 grams of cocaine, a large plastic bag and six smaller plastic bags containing marijuana. Taken from defendant Taylor’s pants were a scale and a bottle of Inositol powder, *625 commonly used to “cut” cocaine in preparation for street level distribution. A beeper and money were seized from Carle. There was no evidence that the defendants engaged in any unlawful conduct towards the taxi driver.
RULINGS OF LAW
Searches conducted without a search warrant are presumptively unreasonable under the Fourth and Fourteenth Amendments. Commonwealth v. An-tobenedetto, 366 Mass. 52, 57 (1974). The Commonwealth has the burden of proving that a warrantless stop and search was justified. Id.[1] Stopping a taxi and detaining its occupants, even briefly, constitutes a “seizure” within the meaning of the Fourth and Fourteenth Amendments, Delaware v. Prouse, 440 U.S. 648, 653 (1979) (a stop to check for a license or registration is “unreasonable” under the Fourth Amendment absent facts showing that the person stopped does not have a license or is driving an unregistered vehicle). Police may briefly detain citizens for investigatory purposes only if they have a reasonable suspicion based on specific and articulable facts that the person is engaged in criminal activfiy. Terry v. Ohio, 392 U.S. 1, 21 (1968).
A stop of a taxi is justified if an officer has “reason to suspect that a person has committed, is committing, or is about to commit a crime.” Commonwealth v. Silva, 366 Mass. 402, 405 (1974). In the present case, it is clear that the officers did not suspect that any crimé had taken place or know who the occupants were. In fact, officer Parlón testified that the only reason he and his partners stopped the taxi was because of the “Operation Taxi” policy. The officers’ sole interest was preventing crimes against cab drivers.
Under certain limited conditions, a stop may be considered reasonable if the government is promoting legitimate governmental interest. The Commonwealth argues that the stop in this case was reasonable because it furthered the legitimate governmental interest of protecting taxi drivers. The reasonableness of such seizures depends on a balance between the public interest and the individual’s right to personal security free from arbitrary interference by law enforcement officers. Commonwealth v. McGeoghegan, 389 Mass. 137, 139 (1983) (discussing circumstances in which a roadblock designed to identify drunk drivers would be upheld), citing Delaware v. Prouse, 440 U.S. at 654. “Operation Taxi” fails the McGeoghegan balancing test because there is simply no evidence in the record that the policy of randomly stopping taxis has ever resulted in the arrest of anybody engaging in criminal conduct against taxi drivers or the reduction in the incidents of crime directed against taxi drivers. Indeed, it seems doubtful that “Operation Taxi” serves any legitimate purpose because all taxis are equipped with emergency lights which can be activated, without the knowledge of the passengers, in the event a taxi driver is in need of assistance.
The Commonwealth argues that since case law upholds policies of checking vehicles parked in rest areas or at the side of the road during the winter months, the “Operation Taxi” policy should also be permissible. See Commonwealth v. King, 389 Mass. 233 (1983); Commonwealth v. Tompert, 27 Mass.App.Ct. 804 (1989). These cases, however, are distinguishable on two grounds. First, “Operation Taxi” involves moving vehicles rather than vehicles which are stopped in the circumstances indicating that the operators might be in need of assistance. There is no reason to believe that a taxi driver with passengers in the back seat is in danger where the cab driver has not activated his emergency lights and where there is no other indication that the driver is in danger. Second, both the United States Supreme Court and the Supreme Judicial Court have repeatedly stressed that policies which give the police “unbridled discretion” to decide which vehicles to stop will not pass constitutional muster. Delaware v. Prouse, 440 U.S. at 663; Commonwealth v. McGeoghegan, 396 Mass. at 81-89 (1985); and Commonwealth v. King, 389 Mass. at 242. In this case the “Operation Taxi” policy fails to meet constitutional requirements because it grants the police the “unbridled discretion" to stop any taxi at any time without any grounds to believe anything is amiss.
Finally, the Commonwealth argues that the stop in this case was reasonable because the taxi driver consented to the stop. Law enforcement officers may conduct a search without probable cause and without a search warrant if they have the consent of a person authorized to give consent to the search. Consent may be given by a third person who possesses common authority over the premises or some other sufficient relationship to the premises or the effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 171 (1974); See also Commonwealth v. Wahlstrom 375 Mass. 115, 118 (1977). A search with consent is reasonable and legal only to the extent that the individual has consented. Commonwealth v. Brown, 32 Mass.App.Ct. 649, 652 (1993). Although the Commonwealth argues that the taxi driver in question assented to the stop, it presented no such evidence. The fact that most taxi drivers do not object to the stops, or that the policy was adopted due to taxi driver pressure does not establish that the individual taxi driver in this case granted his consent to the stop. Moreover, the court doubts that the driver’s consent would justify the stop of the passengers.
ORDER
For the foregoing reasons, the defendants’ Motions to Suppress Evidence are ALLOWED.

The Supreme Judicial Court has adopted an automatic standing rule which allows a defendant, charged with a crime in which possession of evidence seized at the time of the contested search is an essential element of guilt, to contest the legality of the search. Commonwealth v. Amendola, 406 Mass. 592, 601 (1990). Accordingly, the defendants have standing to challenge the evidence taken from the taxi.