UNITED STATES of America, Appellee,

v.

Christopher KING, Defendant, Appellant.

Nos. 83–1018, 83–1454.

United States Court of Appeals,
First Circuit.

Argued Oct. 5, 1983.

Decided Jan. 10, 1984.

William M. Kunstler, New York City, with whom Mark B. Gombiner, and Robert H. Gombiner, New York City, were on brief, for defendant, appellant.

Robert J. Lynn, First Asst. U.S. Atty., with whom W. Stephen Thayer, III, U.S. Atty., Concord, N.H., was on brief, for appellee.

Before BREYER, Circuit Judge, TIMBERS,* Senior Circuit Judge, and SMITH,** Senior District Judge.

RUSSELL E. SMITH, Senior District Judge.

These consolidated appeals are from a judgment of conviction and an order denying the defendant (King) a new trial. The indictment charged King in five Counts as follows:

Count 1: That he, a convicted felon, possessed a Browning pistol affecting commerce (18 U.S.C.App. § 1202(a)(1));

Counts 2 and 4: That he made materially false statements to a licensed dealer in connection with the acquisition of an Ithaca shotgun and a Heckler and Koch pistol (18 U.S.C. § 922(a)(6));

Counts 3 and 5: That he, a convicted felon, had on separate occasions received an Ithaca shotgun and a Heckler and Koch pistol which had been shipped in interstate commerce (18 U.S.C. § 922(h)(1)).

King was convicted and judgment was entered on Counts 1, 3, and 5, and the jury was unable to agree on Counts 2 and 4. There is no question of King's guilt.

The receipt and possession were proved by the following: Sales documents from the licensed dealer who sold King the firearms were introduced. Experts testified that King's signature and fingerprints appeared on the sales documents. Serial numbers on the Browning and on the Ithaca shotgun had been obliterated. The stock had been removed from the Ithaca. The serial numbers were restored by experts. They corresponded with the serial numbers on the documents. King was found in possession

of the Browning, and the Ithaca was in the car in which he was riding. King testified that he bought all of the weapons from the Kittery Trading Post Gun Exchange (Kittery Trading Post) or its affiliate, KTP Gun Exchange, and that he had obliterated the serial numbers from the Browning and Ithaca and had removed the stock from the Ithaca. He further testified that his signature appeared on the sales documents.

The prior convictions were proved by certified copies of the judgments of conviction and by King's own testimony.

The evidence established that the guns had been shipped in interstate commerce. The Ithaca shotgun was manufactured in New York, and the Browning pistol was manufactured in Utah. Records of the seller and of the United States prove that the guns had been in interstate commerce. Records of the seller also prove that the Heckler and Koch pistol had been transported to Maine from Massachusetts prior to the time that King received it.

## ALLEGED FOURTH AMENDMENT VIOLATIONS

■ The evidence supports the district court's findings on the motion to suppress evidence of the guns. The findings are as follows:

On a cold winter night at approximately two o'clock in the morning of February 7, 1982, Massachusetts State Police Trooper Paul Landry pulled into the southbound North Attleboro, Massachusetts rest area off Route 95 for a routine check of all parked vehicles. It was customary State Police winter policy to check parked vehicles for their occupants' safety and crime detection. There were two vehicles in the rest area on this night. One in particular was a 1978 green Plymouth station wagon, another was a van. Trooper Landry did not see anyone in the van, however, he noticed two men in the station wagon as he drove

---

* Of the Second Circuit, sitting by designation.

** Of the District of Montana, sitting by designation.

past it. Turning his cruiser around at the opposite end of the rest area he drove toward the station wagon stopping in front of it, shining the cruiser's headlights into it. One of the occupants, the driver,[1] was a white man, the passenger [2] was a black man. He stepped out of his cruiser and approached the driver. As he approached, he noticed that the two men appeared nervous. Their vehicle's engine was running, but the lights were out and there was a dog, a doberman pinscher in the back cargo area. Trooper Landry noticed a green bag on the floor under the passenger side and another duffle bag in back with the dog. Also, the passenger had his right hand tucked inside his jacket in the area of his trousers' belt. Trooper Landry testified that he suspected the passenger had a gun.

He asked the two men why they were there and asked them for identification. They told him they had come from New Hampshire and were tired. They produced New York drivers licenses. The vehicle was registered in Massachusetts. The driver told the trooper the car belonged to his girl friend, but he didn't know her telephone number when asked. One of the New York licenses, the driver's, had a picture attached to it when it was handed to the trooper, however the passengers [sic] did not. The passenger turned out to be Christopher King, the defendant/petitioner in the instant case. He presented Trooper Landry with a license with the Name [sic] Lester Jordan printed on it with a Brooklyn, New York address. The other license was for a Salvatore Bella also of Brooklyn.

Trooper Landry returned to his cruiser with both licenses and the registration and called into [sic] check on them. The response from headquarters was negative. There were no reports relative to either of the two men or the vehicle.

While waiting for this report, the trooper moved the cruiser from the front of the station wagon to a point directly behind it to watch the two men. Trooper Landry noticed that they continued to act very nervous, constantly looking at each other and back at him. He was suspicious of their identity, the registration of the car, their demeanor and the way the passenger had held his hand inside his jacket. He decided to radio for assistance and Trooper Michael Crosby responded to the call, arriving a few minutes later. Landry briefed Crosby and then the two troopers approached the station wagon from the passenger's side. This time the green bag on the floor under the passenger seat was not there. They asked the passenger to step from the vehicle and when he was outside of it Landry asked him what he had in his coat. As Landry asked the question he reached out to touch the man's jacket and the man jumped back pushing Landry's hand away. However, Landry felt what he thought was a bullet proof vest. Landry told Trooper Crosby to watch the driver and began to draw his gun ordering the passenger to put his hands on his head. Again, Landry reached toward the man's belt and was pushed away. At this moment the driver jumped out of the car and crouching, ran back and forth along the opposite side of the car, popping his head up and down intermittently. Landry grabbed the passenger and pulled back from the car toward the woods behind him as the driver began firing a gun in their direction. Landry dropped the passenger to the ground, pulled a 9 MM semi-automatic pistol from the man's belt and handcuffed him, then returned shots toward the driver who ran off into the woods adjacent to the rest area. Back up assistance arrived, the dog was removed from the station wagon and a light search of the vehicle was conducted at the scene turning up a .45 caliber semi-automatic carbine, a 12 gauge shot gun and quantities of ammunition from the duffle bag that was in the rear of the car. A later inventory search of the vehicle at headquarters turned up the green bag. It had been tucked under the seat and contained

---

1. Now known as Jaan Laaman.

2. Now known to be King.

a .380 caliber semi-automatic pistol and more ammunition as well as numerous licenses and identification belonging to other persons. One of these, however, identified the driver as Jaan Laaman. The passenger, Christopher King, was searched at the barracks and he was found to be wearing a bullet proof vest.

We assume without deciding that there was some illegality in the conduct of the officers prior to the shooting. At the time of the shooting, King was out of the car. Landry had asked him what was in his coat, and he had attempted to touch King's jacket. We do not doubt that, had the shooting not occurred, Landry would have seized the pistol. When the shooting occurred, Landry pulled King to the ground and then pulled the Browning pistol from King's belt. At the moment the shot was fired, Landry had all the probable cause that was needed to search King.

King argues that, since Landry was in the process of illegally searching him when the shot was fired, the search was poisoned by the previous illegality, i.e., that, but for the previous illegality, the shooting would never have taken place. We reject that contention. It has been said that:

> The Court's decisions clearly indicate that the poisonous tree doctrine does not extend as far as a "but for" causation test might take it. If the means of acquiring evidence are substantially removed and distinguishable from the initial illegality, neither the "deterrence" rationale nor the "judicial integrity" rationale requires application of the exclusionary rule.

J. Israel and W. LaFave, *Criminal Procedure, Constitutional Limitations* 290 (3d ed. 1980). We believe that the shooting was an independent intervening act which purged the taint of the prior illegality. In the cases of *United States v. Bailey,* 691 F.2d 1009 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983), and *United States v. Nooks,* 446 F.2d 1283 (5th Cir.), *cert. denied,* 404 U.S. 945, 92 S.Ct. 299, 30 L.Ed.2d 261 (1971), there was an initial illegal stop and a threatened search which would have been successful if uninterrupted by the victim's flight. In each case the search was in progress when flight occurred. In each case the court held that the flight constituted an intervening act which provided probable cause for the ultimate search.

In this case the intervening act happened in the process of what we have assumed to be an illegal search. Here, too, except for the intervening flight, the in-progress search would have led to the items. Here, too, the intervening act gave probable cause. We think the Browning was properly seized.

The argument that King had some expectancy of a right to privacy as to his possessions in Laaman's car is without merit. Whatever may have been the case absent the shooting, it is difficult to find an expectancy of privacy in King after Laaman, the driver of the car, had shot his own rights to privacy away.

## ALLEGED ERROR IN ADMISSION OF EVIDENCE

King asserts that to prove the crime the Government did not need to prove that the gun was loaded; he claims that he was prejudiced by that proof. Were we to agree that the proof was improper, still, in light of all of the evidence, it was not prejudicial. We do not think that on the record here the jury could have reached a verdict other than guilty on Counts 1, 3, and 5. Counsel argues that the case was close as evidenced by the fact that the jury could not reach a verdict on Counts 2 and 4, the counts charging false information. There were additional elements in these counts, and it was only on Counts 2 and 4 that there was room for question.

## ALLEGED SIXTH AMENDMENT VIOLATIONS

King urges that, by reason of the conduct of state and federal law enforcement officers, his sixth amendment rights were violated and the action should be dismissed. We consider first whether King suffered any prejudice because of law enforcement officers' conduct after his arrest,

and second, if not, whether there was a "pattern of recurring violations by investigative officers that might warrant the imposition of a more extreme remedy [dismissal] in order to deter further lawlessness." *United States v. Morrison,* 449 U.S. 361, 366 n. 2, 101 S.Ct. 665, 668 n. 2, 66 L.Ed.2d 564 (1981). The alleged unlawful acts of the officers may be divided into three categories: first, the unauthorized communications between King, the officers, and undercover agents; second, the disparagement of King's lawyers; and third, the planting of a recording device between King and his lawyers.

King was not prejudiced by anything he said or did or by anything said to him after his arrest. His conviction was based on the evidence previously summarized. That evidence was procured by the Government independently of anything said by King after his arrest. No statements made by King, recorded or otherwise, after his arrest were offered in evidence. King's statements did not lead the Government to the evidence which was introduced. There was one conversation which could have furnished the Government with information that King had had firearm dealings with the Kittery Trading Post. This information, however, was furnished on March 27 or 28, 1982, and the record shows that some time prior to March 11, 1982, the Government knew about the Kittery Trading Post and had procured from it and its affiliate, KTP Gun Exchange, the documents used at the trial.

Because of the disparagement, King lost faith in lawyer Doyle and discharged him. The district court refused to grant a continuance so that King could get a new lawyer, and King was told that he could represent himself. However, the court ordered that Doyle stay and assist King in his defense. Doyle actually tried the case. In view of the charges made, we have read the record with special attention to Doyle's representation. In our opinion it was excellent, and given what Doyle had to deal with, the results he obtained were excellent. Whatever the disparagement, it does not appear that the claimed disparagement affected Doyle's performance. If King was uncertain about Doyle, we do not see that that uncertainty had anything to do with the results of the trial. Moreover, King apparently did not dismiss his lawyer, Doyle, until he was fully aware that doing so would help his constitutional claim. Indeed, King did not seek new counsel to pursue his post-trial motions, and Doyle remains associated with the case. Despite our very strong doubts that King can show sufficient prejudice to warrant a retrial (assuming that the disparagement was improper), we request the trial court, which must conduct a further proceeding in any event, to make a specific finding as to prejudice caused by any unwarranted disparagement.

We then turn to the question of whether the conduct of the United States was such that the case should be dismissed to discourage further lawlessness by law enforcement officers. Most of the facts relating to this problem were disclosed in a post-judgment hearing held February 25, 1983.

Before King was arrested, Lamonica, a New Jersey trooper, had been killed in the line of duty. A task force composed of officers from New Jersey, Massachusetts, Rhode Island, and Vermont, from the Federal Bureau of Investigation and the Bureau of Alcohol, Tobacco, and Firearms had been organized to search for the killers of Lamonica. It was known that King had had connections with some of the people suspected of shooting Lamonica. While King was confined, policemen from Massachusetts, New Jersey and Rhode Island and an undercover agent, Berube, visited him. On none of these occasions did the policemen get permission from the lawyers defending King in this case. The consent of King's lawyers to Berube's visits was procured by misrepresentation.

The New Jersey police learned that Berube, a convicted felon then on parole under the supervision of the United States Parole Commission, had offered to cooperate in the search for the killers of Lamonica. On application of the State of New Jersey, the United States Parole Commission issued an

order under which Berube was authorized to act as an undercover informer for the New Jersey police in connection with the Lamonica death. Berube was given no authority to participate in any other matter.

King did not learn of Berube's role in the case until after the entry of judgment. The trial court, in connection with a motion for a new trial, held a hearing at which Berube testified. The motion for a new trial was denied. The facts pertinent to the motion to dismiss were presented at that hearing.

The purpose of the visits from the policemen and Berube was to get information about the fugitives. Among other things, King was offered rewards and help in getting bail if he would cooperate in locating the Lamonica killers, but all references to facts pertaining to this case were by-products of the search for the fugitives.

Most of the visits made by the police officers and Berube to King were proper. The fact that King was indicted for violations of the firearm law did not immunize him from questioning as to the whereabouts of the fugitives. The consent of King's lawyers was not needed to legitimize that questioning. *See Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. DeWolf,* 696 F.2d 1 (1st Cir.1982).

There are, however, two aspects of the undercover operations which concern us. The first concern is the disparagement of King's lawyers. Berube testified that, at the suggestion of the law enforcement officials, he had disparaged King's lawyers. King testified that Officer O'Connor disparaged them.[3] Second, we are concerned with the alleged planting of recording devices. King was charged in the State of Massachusetts with crimes growing out of the incidents which took place at the time of his arrest. At the time of a suppression hearing in the Massachusetts case, Berube testi-

fied that, under the instructions of a police officer, he placed a recording device in a room where King and his lawyers were conferring and that later he planted the same recorder in the courtroom close to King and his lawyers.

We do not approve of undercover agents disparaging the lawyers representing defendants, and we are shocked by the thought that a law enforcement officer would, through an undercover agent, plant a recorder and thus endeavor to intrude into the conversation between an accused and his lawyer.[4] On the record here we are not certain that the alleged disparagement did occur; that an effective recording device was planted; or that the recorder was intended to record anything. Nor are we certain of the degree of the participation of the United States in all of this. The district court made no findings on these issues. We are reluctant to dismiss the action against a defendant, obviously guilty, unless we are convinced that the conduct of the Government fully warrants the dismissal. But where some evidence (if believed) points to the commission of serious acts of misconduct, we are reluctant to affirm without a full investigation of that misconduct. King did make a sweeping request for the issuance of subpoenas, which was denied except as to Berube. Some of the people sought to be subpoenaed might have shed some light upon the problem we face.

For these reasons the cause is remanded to the district judge with directions to hold a hearing to determine whether there was a disparagement of King's lawyers and, if so, who was responsible. The court shall further determine the extent of the knowledge of the Government, both before and after the event. At the hearing, the facts shall be determined as to the recording devices, *i.e.,* whether a device had been planted, where and by whom it had been planted, and who had knowledge of it both before and after the fact. In addition, the court

---

3. As we have previously stated, we very much doubt that this disparagement caused prejudice, but we here consider the disparagement in assessing the totality of the behavior of the law enforcement officials.

4. *See United States v. Levy,* 577 F.2d 200 (3d Cir.1978).

shall determine if the devices were working and, if so, what the contents of the tape were and the identity of the persons knowing those contents. The court shall make findings of fact which resolve any conflicts in the evidence.

The record made at the hearing of March 25, 1983, may be used, and those witnesses need not be recalled unless the court determines that they have additional information. If any documents are not disclosed for any reason, the court shall inspect them in camera and shall reveal any details which are relevant to any issue in this case.[5]

The panel of this court as presently composed reserves jurisdiction.

---

**5.** We have inspected all the material which was sealed. We do not believe that the Lynn affidavit would be of any relevance to the proof of the facts in this case or to the claims that King's rights were violated. Whether portions of Sobera's notes might be relevant depends on the facts that may be developed at the hearing. We leave to the district court the decision about whether to release any such excised portions of the notes to the defense in light of the facts and issues as later developed.