COMMONWEALTH *vs.* GERALD T. LIBBY.

Essex.  December 10, 1985. — February 26, 1986.

Present: GREANEY, C.J., PERRETTA, & FINE, JJ.

*Identification. Practice, Criminal,* Judicial discretion.

At a criminal trial, there was sufficient evidence to warrant a finding that
a photographic identification procedure was not unnecessarily sugges-
tive. [654-655]

At a criminal trial, there was sufficient evidence to warrant a finding that
the victim's identification of the defendant, some two hours after the
crime, while the defendant was being held against a police cruiser did
not create a substantial likelihood of misidentification. [655-656]

At the hearing of a criminal defendant's motion to suppress identifications
of the defendant made by the victim, at which the defendant requested
that he be allowed to absent himself from the proceedings while the
victim was asked whether he saw the defendant in the courtroom, the
judge did not abuse his discretion in giving the defendant a choice of
absenting himself from the courtroom and refraining from asking the
victim whether he saw the defendant in the courtroom, or of remaining
in the courtroom and asking the victim to identify the defendant. [656-657]

INDICTMENTS found and returned in the Superior Court De-
partment on January 18, 1982.

The case was tried before *Herbert F. Travers, Jr.,* J.

*Arlene Beth Marcus* for the defendant.

*Richard A. McGovern,* Assistant District Attorney (*Lila
Heideman,* Assistant District Attorney, with him) for the Com-
monwealth.

PERRETTA, J. On his appeal from guilty verdicts on indict-
ments charging him with armed robbery while masked (G. L.
c. 265, § 17) and unlawfully carrying a firearm (G. L. c. 269,
§ 10[a], the defendant argues: (1) that the victim's out-of-court
identifications were impermissibly suggestive; and (2) that he
should have been allowed to ask the victim to point him out
from among the courtroom spectators even though he (the
defendant) was not in the courtroom. We affirm.

1. *The Facts.*

There are two identifications at issue. One involves photographs and the other is a one-on-one confrontation. We relate the facts surrounding the robbery and the questioned identifications as they were elicited at the hearing on the defendant's motion to suppress.

At 11:30 P.M., on December 21, 1981, Jay Nardone, the owner of the C & J Superette in Lynn, went to his convenience market to prepare for the normal midnight closing. Richard Moulison, an employee, was in the store. Nardone went to the office in the back of the store and made up a bank deposit, which he put in the safe. The safe was located beneath a long counter at the front of the store. There was a lottery table and computer at the counter as well as the cash register.

Having completed the bank deposit work, Nardone began to close out the lottery machine. Moulison was at the cash register. It was about 11:50 P.M. when Nardone, intent upon his lottery computations, sensed the presence of another person in the store. He glanced up, noticed a man about ten feet from the counter, and returned his attention to his work. When he again looked up, Nardone saw that the man was wearing a long white scarf wrapped around his neck in such a fashion that the lower part of his face was concealed.

As Nardone stared, the man raised his white sweater and took a dark, short-barreled revolver from his waist. He pointed the gun at Nardone and announced, "This is a holdup." He next moved behind the counter and put the gun to Nardone's head. The robber then ordered Nardone to open the safe and Moulison to empty the contents of the register into a paper bag. They did so. Nardone and Moulison were ordered to lie on their stomachs, and the robber fled. From start to finish, the robber had been in the store for about five minutes and for half that time, Nardone testified, he stared directly at him. As soon as the robber left the store, Nardone called the police, who arrived within moments.

Nardone described the assailant to the police a number of times. Among those who took Nardone's information were Officers Joseph H. Rowe and Robert Carter. Nardone told them

that the man was about six feet, two to three inches in height, between one hundred and ninety and two hundred pounds, with dark "messy" hair, and wearing a long white scarf wrapped about his face and a dirty white sweater. The police waited while Moulison and Nardone closed the store.

When they left the store, Nardone and Moulison went home, and Rowe and Carter got into their car and began to patrol the immediate area. They noticed a cab at Meadow Court, a housing development for the elderly which was located very near the superette. Rowe used his car radio to call the police station. As a result of that conversation, he learned that the cab had picked up two males at 34 Meadow Court and that they had asked to be taken to the 50 Club. Rowe drove to the 50 Club to await the arrival of the cab.

After waiting for about five minutes, Rowe again called into the police station asking about the cab. He was advised that the passengers had been dropped at Woody's, a bar in Lynn, and that one of them had identified himself as Gerald Libby.

Three cruisers containing six officers, including Rowe and Carter, then converged on Woody's. One of the officers knew Libby and, when inside the bar, the officer pointed Libby out to Rowe. Libby was seated at the bar with his codefendant at trial, Harry Scribner. Rowe went up to Libby and asked if he would step outside. Once outside, Rowe asked Libby if he had come to Woody's by cab from 34 Meadow Court. Libby responded that he had walked there from his home on Chestnut Street. When Rowe advised Libby of the information that the officers had received from the cab company, Libby stated, "All right. I did." He told Rowe that his first denial was due to the fact that he became nervous when he saw all the officers enter the bar. Libby was allowed to go back inside, and Rowe returned to the police station.

Unsettled by the events of the night, Nardone was awake when Rowe called and asked if he could come to the police station. Upon arriving there, Nardone was given a tray containing photographs. He had looked at twelve photographs when he came to the defendant's picture. Without hesitation, Nardone told Rowe that the photograph depicted "definitely the person

who had done it." Rowe, who had said nothing while Nardone was going through the photographs, asked Nardone if he would be willing to take a ride to a bar in Lynn.

Rowe, another officer, and Nardone drove to Woody's and went inside. According to Nardone, there were ten to fifteen people in the bar. He looked around and confirmed that his assailant was not there. They returned to the car and drove toward Union Street because, according to Rowe's testimony, that would be the route one would be most likely to take to get from Woody's to Chestnut Street. Rowe also testified that as they drove he said that they were looking for Libby.

Nardone's testimony gives no indication that he heard that remark or, if he did, that it made any impression on him. Rather, he testified that as they drove along side-streets the cruiser radio was on and there was general conversation back and forth. He stated that, as they drove up Union Street, he saw "another cruiser ahead of us that was stopped and had two people outside, held up against the side of the cruiser." As they closed in on the cruiser, but before Rowe stopped the car, Nardone told Rowe, "[T]hat was the person that held me up." Rowe asked Nardone if he was certain. Nardone replied that he was "pretty sure" but that he'd get out of the car and "take a better look." The defendant was wearing clothes different from those worn during the robbery, but Nardone identified him with certainty. It was then about 2:00 A.M., and the defendant was arrested.

2. *The Judge's Findings.*

In denying the defendant's motion to suppress, the judge read into the record his very specific reasons. The judge found that the lighting conditions in the store were "fairly good" and that there had been a "fairly extensive time period available" during the robbery for Nardone to observe the defendant. The judge described Nardone as being "very careful, very candid, fair, and above all, extremely positive that he has the right man." Nardone's courtroom identification of the defendant "would be based upon [his] original impressions" of the robber, which the judge found to be "indelible."

As for the array of photographs, the judge concluded that, except for two of the pictures which were inappropriate because of the ages of the men therein depicted, the array was fair. Moreover, the police neither said nor did anything improper or suggestive while Nardone was looking through the photographs.

Although the judge found the one-on-one confrontation suggestive in nature, he concluded that the circumstances of the identification made the confrontation necessary to resolve the reliability of Nardone's identification. That is, because the robber had been partially masked, "it is easy to appreciate that the police officer in his own mind would have some reservations" regarding Nardone's perceptions. The "best way" to resolve any question whether a person was being "falsely accused . . . would be to arrange a confrontation in short order," which was done.

Considering the circumstances in their totality — Nardone's initial impressions, his selection of the defendant's photograph from a fair array, and the need to resolve any possible mistake as soon as possible — the judge concluded that Nardone's identification was reliable.

3. *Discussion.*

In assessing an out-of-court identification attacked on constitutional grounds, the question is whether, in the totality of the circumstances, the police have obtained an identification by practices so impermissibly suggestive as to give rise to a very substanital likelihood of irreparable misidentification. See *Simmons* v. *United States,* 390 U.S. 377, 384 (1968); *Commonwealth* v. *Clark,* 378 Mass. 392, 399 (1979); *Commonwealth* v. *Vasquez,* 11 Mass. App. Ct. 261, 264-265 (1981). There is ample record support for the judge's findings concerning Nardone's ability to observe the robber while in the store and the "indelible impression" made by the initial observations. See *Commonwealth* v. *Moon,* 380 Mass. 751, 755-756 (1980).

Turning to the photographic identification procedure, we think it fair to say that, when Nardone was asked to come to the police station, the police had their suspicions about the defendant. When they first arrived at Woody's, they were

fairly certain, if not positive, that he had come from Meadow Court. Conversation with the defendant revealed that, even though he had arrived at Woody's from Meadow Court, he did not reside at the development. However, although the defendant fit Nardone's description, the defendant's clothes differed from those described by Nardone even though the robbery had been committed very recently. In these circumstances, we think that the police acted prudently in choosing to arrange a photographic identification rather than to arrest the suspect.

Looking at the array itself, we find nothing suggestive. Of the photographs looked at by Nardone, only two were inappropriate because of the ages of the men depicted. As for the remaining pictures, we cannot say that the photographs were so few in number or dissimilar to each other or to the description provided by Nardone that the array constituted an unfair cross section. The police said and did nothing, suggestive or otherwise, to draw Nardone's attention to the defendant's picture, which he selected without hesitation or equivocation. See *Commonwealth* v. *Clark,* 378 Mass. at 399-401; *Commonwealth* v. *Vasquez,* 11 Mass. App. Ct. at 265-266; *Commonwealth* v. *Mayo,* 21 Mass. App. Ct. 212, 215-217 (1985).

One-on-one confrontations do not, per se, violate due process rights. "Of course, if there are special elements of unfairness, indicating a desire on the part of the police to 'stack the deck' against the defendant, an identification resulting from such a confrontation would be inadmissible." *Commonwealth* v. *Leaster,* 395 Mass. 96, 103 (1985), and cases cited. When Nardone went with the police to Woody's and then drove with them to Union Street, he knew that the purpose of his presence was to make an identification should they come upon the suspect. That knowledge alone does not, however, taint the reliability of his identification. See *Commonwealth* v. *Hicks,* 17 Mass. App. Ct. 574, 583 (1984). Nor are we concerned that Rowe's statement that they were looking for Libby somehow influenced Nardone's identification. Although the statement should not have been made, it does not appear that Nardone, described by the judge as a fair and credible witness, even heard Rowe's

comment. Moreover, as Nardone knew the reason for his presence but not the name of the suspect, it could not have influenced his identification. Cf. *Commonwealth* v. *Leaster,* 395 Mass. at 103-104.

There can be no doubt that, when Nardone observed the cruiser on Union Street, he did so under circumstances which could be viewed as suggestive. The defendant was being held up against the side of the cruiser. Compare *Commonwealth* v. *Perretti,* 20 Mass. App. Ct. 36, 41 (1985). Even assuming, however, that this identification could have taken place in the form of a lineup, we would not conclude that the identification was, therefore, inadmissible. See *Commonwealth* v. *Bumpus,* 354 Mass. 494, 500 (1968); *Commonwealth* v. *Storey,* 378 Mass. 312, 317 (1979); *Commonwealth* v. *Coy,* 10 Mass. App. Ct. 367, 371 (1980). The confrontation took place promptly after the crime and after Nardone had given an accurate description of the defendant and selected his photograph from a fair array. Rowe's inquiry of Nardone as to whether he was certain must be taken as "designed to avoid the risk of potentially irreparable misidentification." *Id.* at 373. Nor can we overlook the fact that the police did not reveal to Nardone the incriminating information they had about the defendant, that is, that he was seen at Meadow Court almost immediately after the robbery and that, when confronted with that fact, he first denied but then admitted it.

In view of the facts that Nardone had a fair amount of time during the robbery to observe his assailant under good lighting conditions, that he gave an accurate description of the robber to the police, that he selected the defendant's photograph from a fair array, and that the confrontation was not "permeated by 'special elements of unfairness' . . . designed by the police to suggest to [Nardone] that the defendant [was] the criminal," *id.* at 372, the accuracy of the identifications was a question for the jury.

At the hearing on the motion to suppress the identifications, the defendant requested that he be allowed to absent himself from the proceedings and then have Nardone asked whether he saw the defendant in the courtroom. Although the judge

appreciated that the defendant might wish to postpone an in-court identification to the time of trial, he was concerned that the requested procedure might have a element of unfairness to it. He therefore gave the defendant a choice: he could waive his right to be present and refrain from putting the question to Nardone *or* he could remain in the courtroom and have Nardone put to the test. "Since there is no constitutional mandate for these procedures (*Commonwealth* v. *Dickerson,* 372 Mass. 783, 791 [1977]; *Commonwealth* v. *Wheeler,* 3 Mass. App. Ct. 387, 390-391 [1975]), the disposition of any such motion rests in the sound discretion of the judge," *Commonwealth* v. *Ceria,* 13 Mass. App. Ct. 230, 237 (1982), and cases cited. The judge's resolution of this matter was within the breadth of discretion afforded him in such circumstances.

*Judgments affirmed.*