COMMONWEALTH vs. JAAN LAAMAN.

No. 87-431.

Bristol.  November 16, 1987. — February 4, 1988.

Present: GREANEY, C.J., KAPLAN, & FINE, JJ.

*Identification. Due Process of Law*, Identification. *Practice, Criminal*, Motion to suppress. *Search and Seizure*, Automobile. *Constitutional Law*, Search and seizure.

A photographic identification procedure in which, three hours after an armed attack on two State troopers, an eyewitness, shortly before he was shown two photographs, overheard the name of a suspect, and then identified a picture of the defendant as it appeared on a driver's license bearing that suspect's name, was not so suggestive as to require the exclusion of the identification as evidence; furthermore, any suggestiveness in the procedure was outweighed by the reliability of the identification, where the eyewitness had a fair opportunity to view the assailant during the incident, had given the police two descriptions consistent with each other and with another witness's, and had made an immediate and sure identification of the license picture, and where the lapse of time had been relatively short between observation and identification. [360-362]

In the circumstances of a lawful police inquiry of the occupants of a motor vehicle parked in a highway rest area at 2:00 A.M., there was no illegal seizure of a driver's license from the driver such as would require suppression of the license as evidence against the driver in later criminal proceedings, where the length of time the license was held by the investigating officer in order to make a routine inquiry was reasonable, and, in any event, when the defendant began firing a gun at the officer, return of the license was not possible or required. [363-365]

INDICTMENTS found and returned in the Superior Court Department on February 17, 1982.

Motions to suppress evidence were heard by *Augustus F. Wagner, Jr.*, J., and the cases were tried before him.

*Carol A. Donovan*, Committee for Public Counsel Services, for the defendant.

*Dana A. Curhan*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. There was a "shootout" — an attack on two State troopers — at a rest area in North Attleborough in the early morning of February 7, 1982. Christopher King was arrested on the spot and later was tried and convicted of eight firearms charges.[1] Although King was carrying a weapon on his person, he did not fire it. His companion, who did the actual shooting, escaped the scene. Jaan Laaman, the present defendant, believed to be that companion, was apprehended nearly three years later as the result of an FBI raid in Cleveland. Returned to Massachusetts, he has been tried and convicted of two counts of armed assault with intent to murder, of unlawfully carrying a firearm on his person, and of three counts of unlawfully carrying a firearm under his control in a motor vehicle. He appeals, and contends that the judge erred in failing to suppress an identification and certain physical evidence.[2] These matters were heard at pretrial voir dire, and we have the benefit of the judge's findings and conclusions. Holding against the defendant's contentions, we affirm the convictions.

1. *Voir dire.* The findings with amplification from the record yield an account as follows.[3] About 2:00 A.M. on February 7, 1982, with the weather cold and clear, State Trooper Paul Landry, driving in his cruiser No. 320 on the southbound side of route 95, reached a rest area in North Attleborough near the Rhode Island line. Observing a parked green Plymouth station wagon, Landry entered the rest area and positioned the cruiser so that its high beams illuminated the driver's side of

---

[1] An interlocutory appeal from the refusal to suppress evidence failed, *Commonwealth* v. *King*, 389 Mass. 233 (1983), as did an appeal from the convictions attacking the denial of a pretrial motion regarding police misconduct, *Commonwealth* v. *King*, 400 Mass. 283 (1987) (5-2 decision). Federal convictions of King arising from the same incident were the subjects of his unsuccessful appeals in *United States* v. *King,* 724 F.2d 253 (1st Cir. 1984), appeal after remand, 753 F.2d 1 (1st Cir. 1985).

[2] A single justice of the Supreme Judicial Court denied interlocutory appeal of the order, with findings, refusing to suppress physical evidence. A separate order, also with findings, dealt largely with identifications.

[3] This account parallels that set out in *Commonwealth* v. *King*, 389 Mass. 233, 234-239 (1983), but is not the same; it involves a defendant who had a different role in the incident and aftermath.

the wagon. It was regular practice, in accordance with a written directive for "Patrol A," Landry's unit, for troopers in the winter months to approach all stopped or parked cars in such areas and make appropriate inquiries — whether the car or any occupant was in distress, where the car was headed, and so forth.[4] Following this procedure, Landry approached the driver and had a conversation with him, first noticing that the engine was on, the headlights and interior light off, the driver a white man and the other occupant a black man in the passenger seat,[5] a green bag on the floor near the passenger's feet, a large dog pacing in the rear of the wagon. Responding to questions, the driver said they were all right, were resting, had come from New Hampshire and were going to New York. During the talk, Landry observed the passenger moving his right hand inside his jacket just above his waistline and keeping it there. Both men appeared nervous. Landry asked for identification and car registration; the driver handed him a New York driver's license with a photograph stapled to it; the passenger handed the driver, and the driver handed Landry, a New York driver's license having no picture attached; the passenger took a registration from the glove compartment and it was passed to Landry. Folding the registration in his hand, Landry asked who owned the wagon. The driver replied, Lucinda Keith (this name appeared on the registration form). This woman, he said, was his girl friend and lived in Cambridge, Massachusetts; asked what was her telephone number the driver could not respond, although he said he had known her for two years.

Uneasy and suspicious, Trooper Landry returned to his cruiser, repositioned it a little to the rear of the station wagon but still illuminating it, and put in a call for a "missing and wanted" check on the names appearing on the licenses — "Salvatore J. Bella" on the driver's license, which had expired, and "Lester Jordan" on the passenger's license — and for

---

[4] Rapes, homosexual activities, illicit weapons and drugs, drunks and disorderlies had been discovered in the course of such inquiries.

[5] Landry said the presence of a black man in the particular area was very uncommon; it added somewhat to his disquiet about the encounter.

confirmation of the registration. During a five-minute interval awaiting reply, Landry examined the stapled picture (wondering why no picture was attached to the other license) and settled in his own mind that the picture corresponded with the appearance of the driver he had just seen. Radio reported there was nothing outstanding on Bella or Jordan, and there was no information about the registration (which might mean that it was too recent for the computer, or there was a computer mixup or fault, or the registration was fabricated). Landry, particularly concerned about the passenger's movement to his jacket, took the unusual step — unusual where the radio return was neutral — of calling for backup. There was immediate response from Trooper Michael Crosby, who was in a cruiser nearby.

On arrival, Crosby placed his cruiser No. 329 alongside No. 320 with his high beams directed to the driver's side of the station wagon. He left his cruiser and had thirty seconds of conversation with Landry. Landry said he thought the passenger might be carrying a weapon or drugs. The two troopers went to the passenger's window of the wagon. Landry noticed that the green bag was not there. He tapped on the window with his flashlight and asked the passenger to step outside. The passenger did so. Landry asked what he had inside the jacket and attempted to put his hand there. The passenger repelled his hand. Landry told the passenger to put his hands on his head, and then, thrusting inside the jacket, felt a bulletproof vest. He called out to Crosby that the guy had something — watch the driver. As the passenger made a movement to the inside of the jacket, Landry drew his service revolver.

Just then, the driver opened his door and began a crouching "duck walk" on his side of the wagon (perhaps best observed by the witness Nobrega; see below). The driver appeared at the rear right bumper and opened fire in the direction of the troopers. Landry had taken the passenger by the back collar; he held the passenger ahead of him and with his weapon returned fire, then brought the passenger to the ground. Crosby scurried to a dumpster nearby, there were shots apparently in his direction, then he dived into his cruiser, where he radioèd

for help. The driver had fled into the nearby woods. When officers arrived, Landry gave them a short description of the man, and a search began. Landry meanwhile had taken a gun — a .9 millimeter automatic pistol with live rounds — that the passenger carried in his waistband; the passenger was handcuffed and removed to the Foxborough barracks.[6]

There was another witness to the incident. William H. Nobrega, driving a tractor-trailer gasoline tanker on his way back from Bellingham to his home base, pulled into the area in order to do some paperwork and record a remaining partial load of gas. He drew up behind the station wagon, on whose driver's side a police cruiser was shining its high beams. Nobrega began to watch closely when a second cruiser arrived. He saw the two troopers conversing and moving to the passenger side of the station wagon. Then he saw the driver, in the full illumination, sidling out of the car, his left hand still on the driver's wheel as the door opened. The driver crept in a duck walk along the side of the wagon and thus was approaching in Nobrega's line of sight. As the driver reached the rear of the wagon and stood up, with gun in hand, Nobrega had a clear view of him. The continuous observation extended for ten to fifteen seconds. After the shooting, Nobrega had another clear view, eye to eye, when the driver appeared, for a like period to time, near the rear of Crosby's cruiser No. 329. Nobrega said he was anxious about a possible shot at his tanker or being himself taken hostage, and he was paying intense or concentrated attention. Just after the shooting, Nobrega backed up; before leaving the scene he used his two-way radio to try to get word to the troopers' Foxborough barracks; he left the area when reinforcements arrived.

Trooper Landry described the driver to Trooper William Coulter who arrived at the scene, and later at the Foxborough barracks a number of times for the benefit of interested officers. These included FBI agents who thought the driver might be

---

[6] The dog, a Doberman pinscher, was gotten out of the wagon and the wagon was searched cursorily on the scene and fully at the barracks. Recovered were firearms, ammunition, identification papers and photographs, and other things.

associated with a coterie of which one member, Richard Charles Williams, figured as a suspect in the recent murder (December 21, 1981) of a New Jersey State trooper. Landry described the driver thus: white male, wearing green jacket and dark pants, 200 pounds, long brown hair; stocky chest; face — olive complexion, sunken dark eyes, several moles.[7] He emphasized that the moles would be telltale. Landry was certain the picture attached to the Bella license was that of the driver, although he noted differences in the hair or hair style. He was shown other pictures which came from those found in the station wagon (see note 6) and it appears that he said a few of them were of the driver.

Nobrega appeared at Foxborough barracks around 5:00 A.M. He had spoken to police officers at Pawtucket, Rhode Island, and had been advised to report to Foxborough. His description of the driver, given to a Pawtucket officer, and later at the barracks, was: white male, five feet, ten inches, 200 pounds, green autumn type jacket, dark trousers, light brown, wavy hair, a rugged young man in good condition with bulk around the chest. Nobrega said he was shown two pictures, one of them the Bella license picture; he immediately identified the latter as the driver. (The judge found that Nobrega was shown additional pictures and made further identifications of the driver, but the record is unclear.)

At some point on February 7, the fact was confirmed that the passenger was not "Lester Jordan" but Christopher King. King told the officers that the driver was Jaan Laaman.

In late afternoon, February 7, special agent Richard Slowe of the FBI called on Dennis Curzi in East Boston. Curzi was the brother of Barbara Curzi, who was the companion of Laaman and evidently the mother of his child. Curzi knew Laaman very well, he had seen him perhaps a hundred times. Shown a copy of the license picture, Curzi said it was Laaman, although the hairdo was somewhat different from Laaman's when Curzi saw him last in December, 1981.

---

[7] Note that Landry could not well have observed the man's height.

We have now to add that Landry in the course of his testimony identified the defendant in court, Jaan Laaman, as the driver of the station wagon. Nobrega after the lapse of time was not prepared to identify the license picture or the defendant but said he felt his identification on February 7 was strong.[8] Curzi did not deny that he had recognized Laaman in the picture Slowe displayed; but, shown the license picture when he was on the stand, he thought it differed in a couple of details from the one he identified on February 7. The judge himself examined the license picture with Laaman present in the flesh in court. He thought the picture was of Laaman.[9]

Returning, finally, to Nobrega, the assistant district attorney prosecuting the case had notified the defense that Nobrega had stated to him that, before he said at Foxborough that the license picture showed the driver, he had overheard conversation that "Bella" was a suspect. Nobrega subsequently told the prosecutor that he had not heard such conversation and that he would testify that he had not, and he did testify to that effect. Nevertheless the judge, adopting what may be called the "worst case scenario," assumed in his findings that Nobrega had heard of "Bella" before he identified the picture at the barracks.

2. *Identification.* The record at voir dire, considered even without the various supporting factors such as the judge's own appreciation of the license picture, comprises a full round of identification of the defendant as the guilty person. Thus: Landry identified the man in the picture as the driver, and Nobrega made a similar identification. Curzi recognized that man as Jaan Laaman. Landry confirmed his original identification by an in-court identification. Nobrega's memory was less enduring, but he asseverated that his original identification was strong and confident.

─────────────────────

[8] Trooper Crosby was called by the defense as a witness but he made no identification; he had had little opportunity for such observation.

[9] The defendant appeared in court with a beard which interfered to some extent with observing the moles on his face. He was ordered to remove the beard or allow it to be removed, but refused, although warned that this would be a basis for an instruction on consciousness of guilt. Such a charge was given.

The defendant moved to suppress the identifications by Landry and Nobrega and others (taking in events in Cleveland), but on this appeal he has abandoned all but his attack on Nobrega.

The defendant stresses the (assumed) fact that Nobrega overheard a reference to Bella before he viewed the license picture. This grounds an argument that Nobrega's assimilation of the picture with his memory of the driver was the result of undue prompting or "suggestion," and therefore the evidence should not have survived to be put before the jury. We agree with the Commonwealth, in accord with the decided cases, that a number of elements in the present situation make against such exclusion. It is noteworthy that Nobrega had given the police a description of the driver before he heard of Bella or was shown the license picture. See *Commonwealth* v. *Melvin*, 399 Mass. 201, 205 (1987); *Commonwealth* v. *Libby*, 21 Mass. App. Ct. 650, 651-653 (1986). The mention of Bella in some relation to the display of the picture occurred within a relatively short time after the event and while a search for the criminal was still going on. This was comparable to, and less suggestive than, exhibiting a suspect to an eyewitness of a crime shortly after the event in a one-on-one confrontation. Some suggestiveness is permitted in such cases in order to speed detection of the offender or to exonerate the suspect. See *Commonwealth* v. *Denault*, 362 Mass. 564, 566-567 (1972); *Commonwealth* v. *Barnett*, 371 Mass. 87, 91-93 (1976); *Commonwealth* v. *Leaster*, 395 Mass. 96, 102-103 (1985). It is not suggested here that the police deliberately put the name Bella before Nobrega in order to prejudice the operation of his faculties of recollection; the mention of the name was inadvertent. In the latter circumstances there is less reason to admonish the police by barring the evidence; moreover, the witness is less likely to be impressed or affected. Cf. *Commonwealth* v. *Toney*, 385 Mass. 575, 586-587 (1982).[10]

---

[10] Contrast *Commonwealth* v. *Moon*, 380 Mass. 751 (1980), where the witness gave a quite general description of the person to the police, who immediately told the witness that sounded like Moon; in the witness's hearing the police ran a radio check of a car involved and established

So much for "suggestiveness." In consonance with our practice, and following instructions from higher authority, we turn to the question whether the identification was "reliable": if so, then, under *Manson* v. *Brathwaite*, 432 U.S. 98 (1977), the identification may stand even though some suggestiveness may have entered into it.[11] On this question the judge made findings favorable to the Commonwealth covering the essential elements or indicia of reliability (*Manson* at 114-115), and we have no reason to displace them: Nobrega had a fair opportunity to view the driver during the incident, compare *Commonwealth* v. *Melvin*, 399 Mass. at 203, 207; *Commonwealth* v. *Sampson*, 7 Mass. App. Ct. 514, 519 (1979); *Commonwealth* v. *Hicks*, 17 Mass. App. Ct. 574, 578-579 (1984). His description of the man at Pawtucket and at the barracks was accurate, conforming to Landry's, see *Commonwealth* v. *Hicks*, 17 Mass. App. Ct. at 579. He was immediate and sure in identifying the license picture, see *Commonwealth* v. *Sampson*, 7 Mass. App. Ct. at 519; cf. *Commonwealth* v. *Libby*, 21 Mass. App. Ct. at 652-653. There was only a relatively short interval between observation and identification, see *Commonwealth* v. *Mobley*, 369 Mass. 892, 895-896 (1976); *Commonwealth* v. *Melvin*, 399 Mass. at 207. On balance we agree with the judge that the possible suggestiveness of the reference to Bella was outweighed by the factors just stated. Cf. *Commonwealth* v. *Toney*, 385 Mass. at 586-587; *Commonwealth* v. *Hicks*, 17 Mass. App. Ct. at 578; *Commonwealth* v. *Libby*, 21 Mass. App. Ct. at 653-655.

Although the judge was right to decline to suppress Nobrega's identification, the jury were not bound to accept

Moon's ownership; they opened the car and removed and searched a wallet and withdrew a picture which they exhibited to the witness, who agreed that it tallied with the person he had seen. "There was no showing of any exigency . . . ." *Id.* at 757.

[11] Although the Supreme Judicial Court has not decided whether to domesticate the *Manson* doctrine, see *Commonwealth* v. *Venios*, 378 Mass. 24, 27 (1979), citing *Commonwealth* v. *Botelho*, 369 Mass. 860, 870-875 (1976), it has instructed judges to make findings on the factors intrinsic to reliability, as indicated in our text. See *Commonwealth* v. *Moon*, 380 Mass. 751, 759 (1980).

the testimony and were free to give it what weight they chose. See *Commonwealth* v. *Jones*, 375 Mass. 349, 355 (1978); *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 308 (1979); *Commonwealth* v. *Melvin*, 399 Mass. at 208. We may add that it is quite unlikely the jury verdicts actually turned on Nobrega's identification testimony: that testimony was, indeed, probative of the defendant's guilt, but it was dwarfed by other cumulative evidence pointing in the same direction. For example: Landry's contribution was important. Salvatore Bella was called as a witness by the prosecution, and the jury could validly find that he was a lifelong friend of Laaman and had been in touch with him. There was some reason to think that the Lucinda Keith, named in the registration form, who purchased the green Plymouth station wagon on January 29, 1982, was Barbara Curzi. Dennis Curzi testified that in late 1981 Laaman had a Doberman pinscher. It was Barbara Curzi who on February 13, 1982, reclaimed the Doberman pinscher that was taken from the station wagon (see note 6). Lisa and Justin Owens, the tenants in the rented house in Cleveland raided by the FBI in November, 1984, turned out to be in truth Barbara Curzi and Jaan Laaman. There was ballistic testimony that the cartridge casings recovered from the rest area were fired from a .9 millimeter Smith & Wesson handgun found in the master bedroom occupied by this couple. We may add that while the record indicates that the defendant and Richard Williams were in some sort associates — the two (and Barbara Curzi) were together when arrested in Cleveland — the defendant's suggestion that it was Williams who was the driver on February 7 remained conspicuously feeble in support on the record.

3. *Physical evidence.* The defendant's original motion to suppress physical evidence extended to a variety of materials, but he now confines attention to the Bella license with its stapled photograph which assisted in the identifications by Landry, Nobrega, and Dennis Curzi. It was lawful for Trooper Landry to ask to see the license and to hold it in the cruiser while he made routine inquiries over the radio. The legality of Landry's procedure to that extent is confirmed by the opinion

in the *King* case itself, see 389 Mass. 233, 241-244 & n.15 (1983). The judge thought Landry's suspicions were sufficiently grounded to justify a "frisk" of the passenger, asking him to leave the wagon and patting him down. If this were accepted, there would be no illegal action on Landry's part toward anyone through the time of the shootout, and thus no basis for suppressing the license. The judge evidently recognized, however, that the present record regarding the basis for a frisk was not so far better than the *King* record that the *King* opinion could be safely taken to be out of point. On the *King* view, Landry, having received neutral reports by radio, was obliged to return the licenses to the driver and passenger, respectively, and Landry went beyond his rights as an officer when he directed the passenger to leave the wagon.

If that was a wrong, as is assumed, it was such only vis-à-vis the passenger.[12] It would be a mistake to treat the driver as somehow merged into, or the equivalent of, the passenger. Cf. *Wong Sun* v. *United States,* 371 U.S. 471, 491-492 (1963). Landry was required to return the Bella license to the driver and the time allowed for the purpose was a reasonable time. Strictly, Landry's five minutes in the cruiser, awaiting the radio return, should not count; if we do count them, add two to three minutes for Crosby's arrival, thirty seconds for the Landry-Crosby conversation, and a further minute or two to the time when the driver started on his rampage, we have a total of around ten minutes. That was not an unreasonable length of time in the circumstances. Analogy is invited to the reasonable time permitted for a *Terry*-type stop and frisk of an individual: the Supreme Court has refused to adopt a fixed time limit for the procedure, and has upheld, as reasonable, stops well in excess of the time involved here. See *United States* v. *Sharpe,* 470 U.S. 675, 686 (1985).

---

[12] The court held in the *King* case, however, that the line of causation between this wrong and King's arrest was broken by the shootout. The judge below evidently thought the break in causation could have a kind of retroactive effect and could have entitled the Commonwealth to use against King any evidence taken from him before the shootout. In our text we are content to assume the contrary as to King. We point out that the present defendant's situation was different from King's.

An additional factor in the present case further supports a conclusion that the time period was no more than reasonable. We consider in this kind of case what the person himself might anticipate or expect in the way of tolerable official intrusion and inquire whether the intrusion in fact exceeded the expectation.[13] As indicated above, the Bella license showed on its face that it was expired. It is true that Trooper Landry had not seen the driver actually operating the station wagon and thereby committing an offense. But the driver at all events would have expected Landry, before surrendering the license, to remark on the fact that it was void and, at the least, to suggest that the passenger, with a supposedly valid license, exchange places with the driver. The parley would take time. The upshot of all this is that Landry committed no wrong toward the driver up to the time the driver quit the wagon; thereafter return of the license was neither possible nor required. See *Commonwealth* v. *Saia*, 372 Mass. 53, 56-58 (1977).

*Judgments affirmed.*

---

[13] The driver's rights may be justly measured in the light of his own expectations. If the driver's rights were not infringed, we need not delve into the trooper's meditations or motivations. Cf. *Berkemer* v. *McCarty*, 468 U.S. 420, 442 (1984); *Commonwealth* v. *Causey*, 356 Mass. 125, 130 (1969); 4 LaFave, Search and Seizure § 11.3(e), at 329 (2d ed. 1987).