## COMMONWEALTH *vs.* PHILLIP D. WATERS.

No. 88-P-330.

Suffolk. December 8, 1988. — February 28, 1989.

Present: GREANEY, C.J., KAPLAN, & WARNER, JJ.

*Assault with Intent to Murder. Intent. Identification. Practice, Criminal,* Examination of jurors.

At a criminal trial in which the defendant was tried on one indictment for arson and on seven indictments for assault with intent to murder seven named occupants of the dwelling that was set on fire, the evidence and inferences therefrom supported the convictions on each indictment under the instructions given. [67-69]

The judge who heard a motion to suppress a one-on-one identification of a criminal defendant properly concluded that in the circumstances of the confrontation excessive suggestiveness was not demonstrated [69-70]; and, moreover, any error in the denial of the motion was harmless beyond a reasonable doubt in light of the evidence against the defendant [70]

The judge at a criminal trial properly exercised his discretion in ruling that a prospective juror was indifferent. [70-71]

INDICTMENTS found and returned in the Superior Court Department on November 5, 1986.

Pretrial motions were heard by *Herbert Abrams,* J., and the cases were tried before him.

*John F. Palmer* for the defendant.

*Deborah E. Breen,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendant Phillip Waters, appealing from judgments of conviction on one indictment for arson (G. L. c. 266, § 1) and seven indictments for assault with intent to murder naming individual victims (G. L. c. 265, § 15), contends that (1) the latter charges were inapposite and in one respect unproved; (2) identification testimony by a police officer, one

Dino Gonzalez, should have been suppressed on pretrial motion; (3) a challenge for cause of a prospective juror should have been allowed.

We sketch the facts as the jury could have seen them. At 2:00 A.M., Wednesday, September 3, 1986, Officers Dino Gonzalez and Kim Gaddy were on patrol in a cruiser driving down Columbia Road toward Franklin Park in the Dorchester district of Boston. About a block or more ahead to the right they saw the frame house at No. 238 Columbia Road on fire and a man on the porch throwing something through a first floor window. Instantly, the fire intensified. The man then ran from the porch down the sidewalk to the right side of the cruiser and facing it. As the man passed by the cruiser, Gonzalez, the driver, braked and drove in reverse to a parking lot a half block away, reaching it as the man entered the lot. The officers quit the cruiser. A beam from Gonzalez's flashlight briefly lit up the man's face. Gaddy pursued the man over a fence at the border of the lot but lost him.

While she was still in the cruiser, Officer Gaddy radioed a short description of the man, citing a height of five feet, eight or ten inches, dark hooded sweatshirt or jacket, dark pants, and white sneakers.

The officers returned to No. 238. The fire had proceeded rapidly and a man, woman, and infant on the third floor, barred by flames and smoke from a stairway, had to come out to a porch on the second level. The man dropped the infant over the side (providentially it was caught by an officer below), pushed the woman over, then jumped himself. (These three persons were named as victims in separate indictments.)[1] The four persons on the first floor (also named in indictments)[2] and the three on the second floor managed to escape the fire by less heroic means.

Additional police, firemen with apparatus, medics with ambulances, and a number of onlookers had gathered. A half hour or so after Gonzalez and Gaddy spotted the man on the

---

[1] Kearn Turner, Veronica Burton, Nicholas Burton.

[2] Ann Nunes, Nadine Alves, Rudolph Read, William White, III.

porch, the defendant was in the street outside No. 238. Evidently he was standing near two officers, John Kelley[3] and Leo Ronan, who were prepared to lend him protection against an outcry from the crowd that he was responsible for the fire. Officer Gaddy came up and identified the defendant as the man she had seen from the cruiser and pursued through the parking lot.[4] She and officers Kelley and Ronan indicated that Gonzalez also made an identification at this point; Gonzalez himself did not testify to this. The defendant was then led to a cruiser and placed on the back seat. Gaddy identified him as he sat there; so did Gonzalez. Some minutes before Gonzalez made his identification, he had spoken to Ann Nunes, the defendant's girlfriend, one of the four persons who had emerged from the first floor of the burning house. Also before he made his identification, Gonzalez heard Officer Ronan say they had a suspect in the cruiser.

Through the testimony of Nunes we learn that on the previous Monday, after a violent quarrel, the defendant had beaten her. She had complained to the police. She went to stay with her cousin, Nadine Alves, at No. 238. At 8:30 P.M. on the night of the fire, the defendant, who was living in South Easton, appeared at the Alves apartment and asked for Nunes. He was told (falsely) that she was not there. Around 10:00 P.M., the defendant tried the second floor apartment for the same purpose. Lynelle Wood, who lived there with two others, turned him away. She said he was very angry.[5] On this night the defendant could have observed lights on all three floors; he knew the house from a visit on a previous day.

Lieutenant Robert E. Alexander of the arson squad, Boston fire department, testified from examination of various remains that the fire was caused by two "Molotov cocktails" — i.e., bombs consisting of glass bottles filled with "accelerant," in

---

[3] Officer Kelley had observed that the defendant's clothes matched the radio message which he had overheard.

[4] Gaddy and Gonzalez were surprised to learn that the defendant, whom they had seen running, was actually six feet, six inches in height.

[5] Wood's observation of the defendant's clothes matched the radio description.

this case, gasoline, set off by means of a wick, such as a rag soaked in the fluid. The first bomb exploded on the porch; the second, in the first floor apartment.[6] After the defendant was apprehended, his left shoe was taken from him. According to fire Lieutenant Robert Shaw, it smelled of gasoline. Officer Ronan testified to like effect. The sneaker was received by the departmental chemist, Joseph Murphy, on the day of the fire. He also smelled gasoline and chromatographic analysis found gasoline residue in the substance of the sneaker.

1. The defendant moved pretrial to dismiss the indictments charging assault with intent to murder, alleging that the evidence before the grand jury was insufficient to support them. The motion was denied without prejudice to its being renewed at trial; it was so renewed and finally took the form of a motion for required findings on those charges, which was denied in turn.[7] We take the defendant's contention to be that, at least with respect to the six indictments naming victims other than Nunes,[8] the Commonwealth failed to prove the element of assault in the crime of assault with intent to murder.

This argument is peculiar and frail. In *Commonwealth* v. *Maloney*, 399 Mass. 785 (1987), the defendant set fire to a house in which eight persons were sleeping. He was charged in eight counts with attempted murder. The court held that, like the crime of assault with intent to murder, the crime of attempted murder requires proof of a specific intent to kill. See *Commonwealth* v. *Henson*, 394 Mass. 584, 590-592 (1985). See also *Commonwealth* v. *Ennis*, 20 Mass. App. Ct. 263 (1985), *S.C.*, 398 Mass. 170 (1986). As the court did not say in *Maloney* that the intent had to connect particularly to the person named in each count, the defendant is prepared to accept that the intent in either crime may be diffused, so to

---

[6] Around 12:30 A.M. of the same night there had been a small fire at the rear of the house. The fire had run its course before the other started. Firefighters had come and gone.

[7] The defendant rested at the close of the Commonwealth's case without offering evidence on his own behalf.

[8] Originally there were nine indictments for assault with intent to murder. These were reduced by the judge to seven, as the persons named in the other two indictments were not mentioned in the course of trial.

speak, over the group. But, says the defendant, whereas the attempt in an attempted murder need only be some overt act, again not particularly connected to the named person, the assault in an assault with intent to murder must be so connected. The defendant's proved animus against Nunes established the connection in her case, but, he says, the proof failed in the other six cases. In argument, however, defendant's counsel wavers: if Nunes is taken to have been assaulted in the first floor apartment by the thrown bomb and its consequences, counsel is hard put to explain why the same should not hold for the three other persons in the apartment, and, by natural extension, the three persons on the porch.

The trial judge, although apparently tempted to sidestep the defendant's proposition by instructing the jury about "transferred" intent with respect to assault,[9] gave a charge acceptable to the defendant, perhaps somewhat more favorable than he might have expected (he did not object): to convict, the judge said, the jury must find that the defendant intended to (and did) assault the individual named in the indictment, and had also the specific intent to kill the person assaulted. We take the instruction as the law of this case and do not go into the precise merits of the defendant's proposition about connecting the assaults to the named victims. The proof in the present case is strong; it establishes the connections and supports the convictions under the instructions unless, indeed, the defendant must be shown to have had in mind (perhaps to have visualized) each particular victim. Here the defendant knew from the lights in the house and his two approaches to tenants to find Nunes that the place was inhabited; his being twice repulsed fed his anger; at 2:00 A.M., when the house was likely to be full of sleepers, he threw not one but two bombs, and of such strength that they consumed the structure — and closed off exits — with great speed. From these facts the triers were entitled to make inferences, cf. *Commonwealth* v. *Henson*, 394 Mass. at

---

[9] As he indicated in his memorandum denying the pretrial motion to dismiss. As to "transferred" intent, see *Commonwealth* v. *Pitts,* 403 Mass. 665, 668-669 (1989).

591; *Commonwealth* v. *Maloney,* 399 Mass. at 788, and these could satisfy the instructions.[10]

2. We revert to the claim that the judge erred in denying the defendant's pretrial motion to suppress Gonzalez's identification of him at the scene. At the pretrial hearing, the defendant called Gaddy, Gonzalez, and Kelley; their testimony was much to the same effect as their testimony later at trial. Gonzalez said he had the defendant in view as he ran to the parking lot, and at the lot he saw the defendant's face by flashlight. We have Gaddy and Kelley testifying to two successive identifications by Gonzalez, but Gonzalez speaks only of the one he made as the defendant sat in the cruiser. Gonzalez spoke with Nunes; probably she mentioned her trouble with her boyfriend, but it was not made clear just what she said. Gonzalez heard someone say, "We think we got the guy."

The defendant presses the question of excessive suggestiveness in the one-on-one identification. The Commonwealth responds with the accepted justifications for bringing suspect and eyewitness together within a short time of the criminal event. "Some suggestiveness is permitted in such cases in order to speed detection of the offender or to exonerate the suspect." *Commonwealth* v. *Laaman,* 25 Mass. App. Ct. 354, 361 (1988). The defendant takes particular exception to Gonzalez's identification of him when he sat alone in the cruiser after he had presumably been arrested. The grievance is lessened if that identification is taken to have merely confirmed an earlier identification by Gonzalez as the defendant stood by the side of officers Kelley and Ronan. At all events, the fact of the defendant's sequestered position does not itself disqualify the identification; there was a rather similar situation in *Commonwealth* v. *Denault,* 362 Mass. 564, 566-567 (1972); and in sundry on-the-scene confrontations, held permissible, the eyewitness could have inferred that the police believed the person might well be guilty. See *Commonwealth* v. *Barnett,* 371 Mass. 87, 88-89, 91-94 (1976); *Commonwealth* v. *Leaster,*

---

[10] In *Maloney* the court refers to the setting of a fire at 1:30 A.M., when people would be present, as itself providing the basis for the inference of specific intent to kill.

395 Mass. 96, 102-103 (1985); *Commonwealth* v. *Harris,* 395 Mass. 296, 298-300 (1985); *Commonwealth* v. *Williams,* 399 Mass. 60, 66-68 (1987). But cf. *Commonwealth* v. *Moon,* 380 Mass. 751, 756-759 (1980). Suggestiveness there was, "but that of course is true of the class." *Barnett* at 93.[11]

The question is not an easy one. We owe respect to the judge's opinion, on hearing the accounts of this turbulent scene, that the defendant had not made out a preponderant case for pretrial suppression. Such infirmities as attached to Gonzalez's identification were brought home to the jury by the defense through interrogation and argument; and the judge instructed fully about the perils of misidentification.

Although we have dealt with the defendant's contention on its merits, we think any error, if there was one, in failing to suppress Gonzalez's identification(s), was harmless beyond a reasonable doubt. This follows from an appreciation of the narrative in point 1 above. Besides Gaddy's identification, which was not challenged at pretrial, there was a stream of inculpatory evidence commencing with the defendant's quarrel with Nunes and going on to the chemical analysis of his sneakers.

3. The defendant complains that his challenge of a juror for cause was mistakenly overruled. In response to a question put to the jurors about whether any had been victims of violence, this juror came forward and said he and his friends had been repeatedly so abused. In a frank colloquy with the judge, he said he had unresolved feelings about these experiences; as he walked about he tended to pick out poor black men as possible assailants; but he was aware of his possible bias and his current training in "organization behavior" was helping him come to terms with his problem. He thought he could be impartial; he

---

[11] We are adjured to speak of "reliability" even though it remains unsettled in this jurisdiction how far that factor may overcome the defect of undue suggestiveness, should that be found to exist. See *Commonwealth* v. *Laaman,* 25 Mass. App. Ct. at 362. Gonzalez had opportunities to observe the fleeing man. It is some assurance of reliability that his identification was near in time to his observations. He said he remembered the man's face as well as the hooded sweatshirt, but he had not described the face to anyone before he identified the person.

didn't think his experiences would affect his judgment in a case. The judge ruled the juror to be indifferent. Thereupon the defense challenged this juror peremptorily. By the time the jury were seated, both sides had exhausted their peremptories.

The judge committed no error in holding that the juror could act without bias, a decision in which the judge conducting the trial is allowed a broad discretion. See *Commonwealth* v. *Sheline*, 391 Mass. 279, 289-290 (1984). Thus we need not go on to consider whether error, if there was any, would be immaterial where in the end, although at the expense of one peremptory challenge by the defense, the jury was composed of qualified persons who were not challenged for cause. See *Ross* v. *Oklahoma*, 487 U.S. 81, 86 (1988).

*Judgments affirmed.*